NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

**FRAN M. JACOBS**
DIRECT DIAL: +1 212 692 1060
PERSONAL FAX: +1 212 202 6413
*E-MAIL:* FMJacobs@duanemorris.com

*www.duanemorris.com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

April 25, 2018

VIA ECF and BY HAND

Honorable Edgardo Ramos
United States District Judge for the Southern District of New York
c/o Court Security Officers
500 Pearl Street – Worth Street Entrance
New York, NY 10007

      Re:    Kraft Food Group Brands LLC v. Bega Cheese Limited (1:17-cv-8104)(ER)

Dear Judge Ramos:

In accordance with Your Honor's March 9, 2018 order, we are writing to provide an update of the status of the proceedings in Australia.

On April 20, 2018, following hearings on March 1, 15, and 23, 2018, the Federal Court of Australia issued the attached decision stating that it was "inclined to grant an injunction the effect of which will be to restrain the first applicant [Kraft Foods Group Brands LLC ('KFGB')] from taking any further steps in the arbitration pending the determination of this proceeding, and to make directions for the filing of evidence, and fixing the proceeding for trial, with the expectation that it will commence in the next month or two." (Apr. 20, 2018 Tr. 52:170.)

The Federal Court of Australia scheduled a further hearing on Monday, April 23, 2018, to give the parties an opportunity to make submissions concerning the form of order that the injunction order should take. At that hearing, the argument concerning the form of the injunction order was adjourned to a further hearing on Thursday, April 26, 2018.

In the meantime, the injunction granted on February 16, 2018 remains in place.

Respectfully,

*Fran M Jacobs*

Fran M. Jacobs

Encl.
cc:    Paul Weiss Rifkind Wharton & Garrison LLP (via ECF)

# FEDERAL COURT OF AUSTRALIA

## Kraft Foods Group Brands LLC v Bega Cheese Limited [2018] FCA 549

| | |
|---|---|
| File number(s): | VID 1220 of 2017 |
| Judge(s): | O'CALLAGHAN J |
| Date of judgment: | 20 April 2018 |
| Catchwords: | **ARBITRATION** – International arbitration – application for anti-arbitration injunction restraining the taking of any further steps in an arbitration commenced before the International Centre for Dispute Resolution in New York |
| | **ARBITRATION** – whether substantial overlap of issues between curial proceeding and international arbitration |
| | **ARBITRATION** – whether anti-arbitration injunction necessary to protect the integrity of court's proceedings and processes |
| | **ARBITRATION** – whether co-existence of curial and arbitral proceedings vexatious or oppressive |
| | **ARBITRATION** – proper approach to construction of an arbitration agreement – whether a dispute the subject of a curial proceeding is the subject of an arbitration agreement – meaning of "arises out of or relates to" |
| | **ARBITRATION** – whether waiver or election not to pursue arbitral relief |
| | **ARBITRATION** – whether "complete relief" available when relief sought in international arbitration for violation of ss 32(1) and 43(a) of the *Trademark Act of 1946* (US) (the Lanham Act) |
| | **ARBITRATION** – expert opinion evidence – whether Lanham Act claim untenable |
| Legislation: | *Australian Consumer Law* (Sch 2 of the *Competition and Consumer Act 2010* (Cth)), s 18 |
| | *Federal Court of Australia Act 1976* (Cth), s 22 |
| | *International Arbitration Act 1974* (Cth), s 7 |
| | *Trade Marks Act 1995* (Cth) |
| | *Trademark Act of 1946* (US) (the Lanham Act), ss 32(1), 43(a) |
| Cases cited: | *Allergan Pharmaceuticals Inc v Bausch & Lomb* [1985] ATPR 40-636 |
| | *AmTrust Europe Limited v Trust Risk Group SPA* [2015] |

EWHC 1927 (Comm)

*BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169

*Claxton Engineering Services Limited v TXM Olaj-Es Gazkutato Kft* [2011] EWHC 345 (Comm)

*Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* (2006) 157 FCR 45

*CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345

*DJL v The Central Authority* (2000) 201 CLR 226

*Excalibur Ventures v Texas Keystone* [2011] 2 Lloyd's Rep 289; [2011] EWHC 1624 (Comm)

*Exford Pines Pty Ltd v Vlado's Pty Ltd* [1992] 2 VR 449

*Fencott v Muller* (1983) 152 CLR 570

*Fitzpatrick v Emerald Grain Pty Ltd* [2017] WASC 206

*Francis Travel Marketing Pty Ltd v Virgin Atlantic Airways Ltd* (1996) 39 NSWLR 160

*Hancock Prospecting Pty Ltd v Rinehart* (2017) 350 ALR 658; [2017] FCAFC 170

*Henderson v Henderson* (1843) 3 Hare 100; 67 ER 313

*Hogan v Hinch* (2011) 243 CLR 506

*Hogan v Pacific Dunlop Ltd* (1988) 83 ALR 403

*IBM Australia Ltd v National Distribution Services Ltd* (1991) 22 NSWLR 466

*Incitec Ltd v Alkimos Shipping Corporation* (2004) 138 FCR 496

*Jackson v Sterling Industries Limited* (1987) 162 CLR 612

*Jasmin Solar Pty Ltd v Trina Solar Australia Pty Ltd* (2015) 331 ALR 108; [2015] FCA 1453

*La Donna Pty Ltd v Wolford AG* (2005) 194 FLR 26

*Marlborough Harbour Board v Charter Travel Co Ltd* (1989) 18 NSWLR 223

*National Commercial Bank v Wimborne* (1979) 11 NSWLR 156

*Netcomm (Australia) Pty Ltd v Dataplex Pty Ltd* (1988) 81 ALR 101

*Port of Melbourne Authority v Anshun Pty Ltd* (1981) 147 CLR 589

*Recyclers of Australia Pty Ltd v Hettinga Equipment Inc* (2000) 100 FCR 420

*TCL Air Conditioner (Zhongshan) Co Ltd v The Judges of the Federal Court of Australia* (2013) 251 CLR 533

*TS Production LLC v Drew Pictures Pty Ltd* (2008) 172 FCR 433

| | |
|---|---|
| Date of hearing: | 1 March 2018, 15 March 2018, 23 March 2018 |
| Registry: | Victoria |
| Division: | General Division |
| National Practice Area: | Commercial and Corporations |
| Category: | Catchwords |
| Number of paragraphs: | 171 |
| Counsel for the First and Second Applicant: | Mr D J Batt QC and Mr I P Horak |
| Solicitor for the First and Second Applicant: | Spruson & Ferguson Lawyers |
| Counsel for the Respondent: | Dr A S Bell SC and Mr C Smith |
| Solicitor for the Respondent: | Addisons Lawyers |

# ORDERS

VID 1220 of 2017

BETWEEN:       **KRAFT FOODS GROUP BRANDS LLC**
First Applicant

**H.J. HEINZ COMPANY AUSTRALIA LIMITED**
Second Applicant

AND:       **BEGA CHEESE LIMITED**
Respondent

JUDGE:       **O'CALLAGHAN  J**

DATE OF ORDER:  **20 APRIL 2018**

## THE COURT ORDERS THAT:

1.    The matter be relisted at 9.30am on 23 April 2018 for hearing about the further orders and directions for the conduct of this proceeding in light of these reasons.

Note:  Entry of orders is dealt with in Rule 39.32 of the *Federal Court Rules 2011*.

# REASONS FOR JUDGMENT

**O'CALLAGHAN J:**

**Bega's application for an anti-arbitration injunction**

1. On 16 February 2018, on the ex parte application of the respondent, Bega Cheese Limited (**Bega**), I made, among other interim orders, an order restraining the first applicant, Kraft Foods Group Brands LLC (**Kraft**), from taking any step in arbitration proceedings commenced by Kraft on 13 February 2018 before the International Centre for Dispute Resolution in New York (the **arbitration**). Bega now seeks permanent relief.

2. This proceeding, in which Bega makes its application for injunctive relief, was commenced by Kraft on 9 November 2017, following the broadcast of television and radio advertisements caused to be aired by Bega relating to its peanut butter product. Kraft (and the second applicant, H.J. Heinz Company Australia Limited) alleges that Bega contravened s 18 of the Australian Consumer Law, which is at Schedule 2 of the *Competition and Consumer Act 2010* (Cth) (the **Australian Consumer Law**). It provides: "A person must not, in trade or commerce, engage in conduct that is misleading or deceptive or is likely to mislead or deceive".

3. Kraft pleads that the advertisements contain a number of false or misleading representations, including that Kraft peanut butter is now Bega peanut butter or is being replaced by Bega peanut butter and that the Kraft brand has changed to or is changing to Bega peanut butter. Kraft seeks final relief, permanent injunctions and an award of damages in respect of the alleged breaches of the Australian Consumer Law.

4. The five allegedly false, misleading or deceptive advertisements are contained in exhibit A3 (a blue USB stick) and exhibit A4 (a red USB stick). In the course of oral submissions, counsel for Kraft said that Kraft intends at trial to rely only on the three advertisements comprising exhibit A3, being:

    (1) A radio advertisement, broadcast on multiple radio stations nationally as part of regular traffic report segments, in which an announcer says: "Australia's favourite peanut butter has changed its name. Kraft peanut butter is now Bega peanut butter. Never oily, never dry, with the same taste you've always loved, and now is Aussie owned by Bega."

- 2 -

    (2)    A television advertisement broadcast on major television networks and digital channels, which shows a jar of Kraft peanut butter, as an announcer says "Australia's favourite peanut butter has changed its name to Bega peanut butter." The Kraft label on the jar is then peeled off, revealing the Bega peanut butter label. The announcer continues: "It's never oily, never dry, with the same taste you've always loved, and now Australian owned and made. Bega peanut butter."

    (3)    A television advertisement broadcast on the major television networks in metropolitan markets depicting a worker named "Charlie" taste-testing peanut butter in which an announcer says: "Charlie's quality tested Australia's favourite peanut butter here in Port Melbourne for 18 years. Now that it's owned by Bega, let's see what's changed." "Charlie" then tastes the peanut butter and says "it's the same". The announcer then says: "Same recipe, same great taste. Now Aussie owned by Bega". The Kraft label on the jar is then peeled off to reveal the Bega peanut butter label.

5    Kraft commenced the arbitration which Bega seeks to restrain on 13 February 2018, almost four months after Kraft commenced a proceeding in the United States District Court for the Southern District of New York (**United States District Court**), seeking to compel mediation and arbitration of a dispute between Kraft and Bega about "ownership of the Peanut Butter Trade Dress". The ownership dispute arises under, or relates to the terms of, a Master Licence and Ownership Agreement dated 27 September 2012 (the **master agreement**) to which Bega became bound when it acquired the rights, and assumed the obligations, of Mondelez International Inc (**Mondelez**), which was an original party to the master agreement.

6    "Trade dress" is a term used in United States trade mark law that refers to the appearance of product packaging: see, for example s 43(a) of the *Trademark Act of 1946* (US) (the **Lanham Act**). The relevant trade dress in this case is peanut butter trade dress comprised of a combination of a jar with a yellow lid and a yellow label with a blue or red peanut device, with the jar having a brown appearance when filled, viz:

 

7    Kraft's proceeding in the United States District Court is currently adjourned, pending the determination of this application.

**Bega's grounds for an anti-suit injunction**

8    Bega relies on the decision of the High Court of Australia in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, which is considered later in these reasons, and says that this court should prevent the arbitration from proceeding on two grounds. First, Bega says that if the arbitration is allowed to proceed at the same time as this proceeding it will interfere with, or will have a tendency to interfere with, this proceeding and the court's processes because there is a possibility or probability of inconsistent findings. Secondly, Bega says that such an injunction should go in the exercise of the court's equitable jurisdiction, because to permit the arbitral proceeding to continue together with this proceeding would, according to the principles of equity, be vexatious or oppressive.

**Bega's case for an injunction**

9    Bega contends that this proceeding relates in significant part to, and has a very substantial overlap with, the issue that lies at the heart of the arbitration: that is, whether, by the terms of the master agreement, Kraft or Bega owns the get-up (or trade dress, they mean the same thing) and therefore the good will relating to peanut butter.

10   Bega contends that a critical part of the television advertisements in respect of which Kraft seeks relief in this proceeding is the presentation of the peanut butter in the trade dress or get-up, and that the false or misleading representations pleaded by Kraft in this proceeding have as their "central pictorial component" the presentation of Kraft's product "in its dress or its get-up".

11   Bega contends that the court should grant the injunction to protect the integrity of its proceedings and processes which Kraft set in motion and then prosecuted, including by filing a statement of claim and a reply to Bega's defence, participating in procedural directions, seeking discovery, filing a notice to produce, consenting to the filing by Bega of a counterclaim, in which the issue of ownership of the trade dress issue is squarely raised, and then filing a defence to that counterclaim.

12   Bega says that unless the arbitration is enjoined, there will exist a probability or possibility of duplicated litigation and a risk, inimical to the rule of law, of inconsistent findings about the critical question of whether Kraft, or Bega, owns the relevant get-up/trade dress and

- 4 -

goodwill.   Relatedly, Bega contends that the arbitration interferes with the court's proceedings and processes because if relief were granted in the arbitration restraining the use by Bega of the trade dress, that would necessarily restrain the broadcasting of the advertisements the subject of this proceeding and "would subsume the very relief which is being asked for here".

13    Bega also contends that the court should grant the injunction, consistently with equitable principles, because it is vexatious or oppressive to compel Bega to defend substantially the same claim in two places at once.

14    Bega also contends that, by issuing this proceeding, Kraft has waived, or elected not to pursue, its right to arbitrate the dispute the subject of the notice of arbitration in New York. Bega contends that Kraft failed to insist upon its right to arbitrate the dispute the subject of this proceeding by choice, and that this is a significant discretionary factor which should weigh in favour of granting the injunction.  A related submission was also made that Kraft had a contractual right to insist on arbitration, and even if its conduct did not amount to waiver or an election, it has lost that right because it has acted in a way that equity would regard as unconscionable in the circumstances.

**Kraft's case resisting an injunction**

15    Kraft contends, on the contrary, that the causes of action and relief sought in this proceeding are entirely separate from those raised in the arbitration; that it has not waived any rights to exercise its rights to arbitrate; and that it seeks simply to enforce and to comply with the contractual bargain contained in the master agreement, which also binds Bega, as the successor to Mondelez.

16    Kraft says that the dispute the subject of this proceeding, which it calls "the Advertising Dispute", and the dispute the subject of the notice of arbitration, which it calls "the Trade Dress Dispute" have nothing to do with each other, and that there is therefore no risk of inconsistent decisions being made.  It also points to the fact that the s 18 case it brings under the Australian Consumer Law in this proceeding includes a claim of misleading or deceptive conduct with respect to a radio advertisement, which self-evidently could not feature any form of trade dress.

17    Kraft further contends that the causes of action the subject of this proceeding do not "arise out of or relate to" the master agreement, and that conduct of the kind proscribed by the

Australian Consumer Law will be established, if at all, irrespective of the contractual relations of the parties. The master agreement, it was submitted, is mere background. It says therefore that the dispute the subject of this proceeding was properly brought in this court and was not intended by the parties to the master agreement to be the subject of arbitration. Kraft says for that reason alone the injunction should be refused.

18      Kraft contends that Bega has known since late September 2017 that it, Kraft, intended to invoke its right to arbitrate the "Trade Dress Dispute", well before Kraft commenced this proceeding and before the broadcasting of the advertisements which prompted Kraft to issue this proceeding. Kraft also says that Bega, by its US attorneys, assured the judge to whose docket Kraft's motion to compel arbitration was allocated, the Honourable Judge Edgardo Ramos, that the issues raised in this proceeding were separate from the issues the subject of the notice of arbitration; that it intended to comply with the dispute resolution provisions of the master agreement, including mediation and arbitration; and that this proceeding did not seek judicial determination of the Trade Dress Dispute. Those considerations, Kraft submitted, go to the issues of whether Bega is, in fact, vexed or oppressed; whether it (Kraft) has waived its rights to arbitration; and to the court's equitable discretion to grant injunctive relief.

19      Kraft also relies on the fact that part of the case it seeks to arbitrate in New York involves a claim under the Lanham Act, which confers a statutory right to enforce an unregistered trademark (a cause of action unknown to Australian law). It says that an Australian court cannot hear such a foreign statutory claim and that because it cannot, therefore, be afforded "complete relief" in this proceeding, the court must dismiss Bega's application for an anti-arbitration injunction.

20      Kraft also contends that the question whether it has waived, or elected not to pursue, its right to arbitrate by choosing to bring this proceeding, falls to be determined not by this court, but by the United States District Court, which has the relevant supervisory jurisdiction over the arbitrators, or by the arbitrators, so that the question of waiver is irrelevant to the exercise of this court's discretion on the hearing of this application.

**Bega's reply submission**

21      In reply, Bega says, in substance, that the dispute the subject of this proceeding does "relate to" the master agreement and that Kraft was bound to have sought to invoke the dispute resolution provisions in that agreement – which provides for mediation and, if unsuccessful,

- 6 -

arbitration – and not to issue this proceeding. Having instead issued this proceeding, Bega says that this court must consider the waiver question, and that Kraft, as the author of the interference with the court's proceedings and processes, must live with the consequences of its choice.

22    As for the Lanham Act claim, Bega submits that this court would have jurisdiction to hear the claim for relief brought in the arbitration under that Act pursuant to its pendent or accrued jurisdiction, because it arises out of the same sub-stratum of facts pleaded in this proceeding. It also contends that, in any event, its un-contradicted expert evidence establishes that the Lanham Act claim is untenable because the relevant conduct alleged about misuse of the peanut butter trade dress, which occurred only in Australia and New Zealand, has no, or no substantial, connection with United States commerce; Bega is not a United States company and has no presence in the United States; and that, accordingly, as a matter of law, the provisions of the Lanham Act relied upon cannot operate extra-territorially.

23    Bega says that the submissions that it made to Judge Ramos before Kraft issued this proceeding are neither here nor there for current purposes. Bega contends that it made it clear to Judge Ramos and Kraft at all times that it reserved its position on the question whether Kraft had waived any right to arbitrate, and that it could not have known the degree to which the matters the subject of the notice of arbitration overlapped with the issues in this proceeding until it was served with a document detailing the ambit of the arbitration, which did not occur until 13 February 2018.

### Jurisdiction

24    Where a court decides to grant an injunction restraining a foreign curial or arbitral proceeding, the order is directed not against the foreign court or tribunal, but against the parties. Such an order thus operates in personam. If there are grounds for an injunction, the orders, therefore, must be directed at the conduct of the party against whom relief is sought. See *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871, 892; *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 395.

25    This court has jurisdiction to grant an anti-arbitration injunction in this case because Kraft commenced this proceeding here seeking permanent relief and damages. It is thus amenable to this court's personal jurisdiction.

**The facts**

26    It will be apparent that the parties disagree about a large number of critical factual and legal questions. In order to deal with those questions, it is first necessary to set out the contractual relationship between Kraft and Bega; the history of the facts which gave rise to the disputes between them; the claims made by Kraft and by Bega in this proceeding; the claims made by Kraft in the arbitration; and the procedural history of this proceeding and the arbitration.

*The evidence of Mr de Souza*

27    Kraft relied on an affidavit of Mr Bruno de Souza. He is the Managing Director, ANJ Region of the Kraft Heinz Company. He is responsible for all Kraft Heinz operations in Australia and New Zealand, among other countries.

28    Mr de Souza deposed to the following facts, which were not disputed. KRAFT (the **Kraft brand**) is a well-known and valuable grocery brand. The Kraft brand has a long history in Australia. Kraft cheese was first sold in Australia in 1926. Nowadays, the value of the Kraft brand worldwide is estimated to be over USD 9 billion. Kraft peanut butter has been sold in Australia for over 50 years. The Australian peanut butter market was worth AUD 110 million in annual sales for the 12 months prior to March 2017 and, as at March 2017, Kraft peanut butter's share of that market was around 65%. The present owner of the Kraft brand in Australia is the first applicant, Kraft Foods Group Brands LLC, which owns numerous registrations in Australia and around the world for trademarks comprising or including the word KRAFT, including registrations in Australia that cover peanut butter.

29    In 2012, the global business of Kraft Foods Inc was restructured into a grocery business and a snack foods business. Kraft Foods Group Inc was established to own and run the grocery business. That company subsequently merged with Heinz to form the Kraft Heinz Company. The Kraft Heinz Company is the world's fifth largest food and beverage company, with global sales in 2016 of around USD 26.5 billion. The applicant companies are both wholly owned subsidiaries of Kraft Heinz Company. Kraft Foods Inc was to own and run the snack foods business. That company subsequently changed its name to Mondelez International Inc.

30    As part of that restructuring, the trademarks and other intellectual property rights of Kraft Foods Inc were allocated between the two businesses pursuant to the master agreement. The parties to the master agreement are Kraft Foods Global Brands LLC (which is an IP holding company for Mondelez) and Kraft Foods Group Brands LLC (which is an IP holding

- 8 -

company for Kraft Heinz Company).  Under the master agreement, ownership of the Kraft brand globally was assigned to Kraft Foods Group Brands LLC, which granted to Mondelez a ten-year exclusive license to use the Kraft brand in Australia and New Zealand in relation to certain product categories, including peanut butter.  The master agreement was subsequently amended to provide that Mondelez's licence to use the Kraft brand in Australia would expire on 31 December 2017.

31    In January 2017, Bega announced that it had agreed to purchase Mondelez's Australia and New Zealand grocery and cheese business, including its peanut butter business.

*The Master License and Ownership Agreement*

32    By the terms of the master agreement, Kraft agreed to license to Mondelez the Kraft trademark and related trade dress (including the Peanut Butter Trade Dress, as defined) in many countries throughout the world, including Australia.  Under the master agreement, the "Trademarks" licensed to Mondelez, including the Kraft trademark, are defined to include "all related Trade Dress". "Trade Dress" is, in turn, defined to mean "the rights in the registered or unregistered characteristics of the visual appearance of a product packaging including the shape or appearance of the container, graphic design, and color scheme or design, or a combination of any of the foregoing that serve as a source identifier and are used on the package in combination with a licensed [Kraft] Primary Brand or a licensed [Mondelez] Brand, as the case may be".

33    The master agreement also provided, in clause 3.5(b), that Mondelez (and now Bega), should it wish to announce a transition of a product name in advertising, marketing, sales materials and product packaging, "shall not denigrate or tarnish the image and reputation" of any licensed trademark "or aggravate a potential market entry by" the Licensor (Kraft) "after the expiration or termination of the Trademark license".

34    The dispute resolution clause is contained in section 7.1 of the master agreement.  It provides:

> Step Process: Any controversy or claim arising out of or relating to this Agreement, or the breach thereof (a "Dispute"), shall be resolved: (a) first, by negotiation and then by mediation as provided in Section 7.2; and (b) then, if negotiation and mediation fail, by binding arbitration as provided in Section 7.3. Each party agrees on behalf of itself and each member of its prospective Group that the procedures set forth in this Article VII shall be the exclusive means for resolution of any Dispute. The initiation of mediation or arbitration hereunder will toll the applicable statute of limitations for the duration of any such proceedings.

35    Section 7.2 deals with negotiation and mediation.  It provides:

Negotiation and Mediation. If either party serves written notice of a Dispute upon the other party (a "Dispute Notice") the parties will first attempt to resolve such Dispute by direct discussions and negotiation. If a Dispute is not resolved within forty five (45) days, the parties will attempt to settle the dispute by mediation under the current Center for Public Resources/International Trademark Association ("CPR/INTA") Model Procedure for Mediation of Trademark and Unfair Competition Disputes. The mediator will be selected from the CPR/INTA Panel of neutrals in accordance with its selection process. If a good faith attempt by the parties to select from this Panel does not result in the selection of an available suitable mediator, the parties will ask CPR to further assist in the selection in accordance with its standard selection process using other panels.

36    Section 7.3 deals with arbitration. It provides:

Arbitration.

(a) If mediation conducted pursuant to Section 7.2 fails to resolve the Dispute within forty five (45) days of the demand for mediation, either party shall have the right to commence arbitration. In that event, the Dispute shall be resolved by final and binding arbitration administered by the International Centre for Dispute Resolution (the "ICDR") in accordance with its International Arbitration Rules. The place of arbitration shall be New York City, New York. Any Dispute concerning the propriety of the commencement of the arbitration shall be finally settled by such arbitration. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof or having jurisdiction over the relevant party or its Assets.

(b) The number of arbitrators shall be three. The claimant shall designate an arbitrator in its answer to the request for arbitration. When the two co-arbitrators have been appointed, they shall have 21 days to select the chair of the arbitral tribunal, and if they are unable to do so, the ICDR shall appoint the chair by use of the "list method."

37    Section 7.4 deals with interim relief. It provides:

Interim Relief. The parties acknowledge and agree that a party would suffer irreparable harm from a breach by the other party of this Agreement, and that remedies other than injunctive relief may not fully compensate or adequately protect the non-breaching party for or from such a violation. Therefore, at any time during the pendency of a Dispute between the parties, either party has the right to apply to any court of competent jurisdiction for interim relief, including pre-arbitration attachments or injunctions, necessary to preserve the parties' rights or to maintain the parties' relative positions until such time as the arbitration award is rendered or the Dispute is otherwise resolved. During the pendency of any Dispute and/or any such interim relief proceeding, the parties shall continue to perform all obligations under this Agreement.

38    Section 8.4 contains a waiver provision. It provides:

Waiver. No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they

- 10 -

would otherwise have hereunder. Any agreement on the part of any party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such party.

39    Section 8.9 is the governing law provision. It provides:

> Governing Law. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal Laws of the State of New York, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York (other than Section 5-1401 of the New York General Obligations Law).

### Kraft serves a notice of dispute

40    On 27 September 2017, Kraft Heinz wrote to Bega giving notice of a dispute "regarding ownership of Trade Dress" under the master agreement. The letter relevantly provided as follows:

> 2 ...we have previously exchanged correspondence with Mondelez in relation to the ownership of the trade dress used for peanut butter sold under the KRAFT trademark in Australia prior to the date of the [master agreement]. That trade dress features, among other characteristics, a jar with a yellow lid, with the jar having a brown appearance when filled ("Peanut Butter Trade Dress").
>
> 3 We remain of the view that Kraft is the owner of the Peanut Butter Trade Dress under the [master agreement]. The [master agreement] contemplates that ownership of trade dress follows ownership of the trademark used in connection with such trade dress.
>
> ...
>
> 6. From a commercial perspective, and from the perspective of avoiding consumer confusion, it would be extraordinary to split a brand from the trade dress with which it has been associated for many years. If the parties had intended such an outcome, it would be expected that this would have been clearly and unequivocally addressed in the [master agreement].
>
> ...
>
> 8. We have previously raised our concerns with both Mondelez and Bega in relation to the use by Mondelez and subsequently Bega of the Peanut Butter Trade Dress separately from the mark KRAFT.
>
> 9. Use of the Peanut Butter Trade Dress separately from the mark KRAFT has a significant detrimental effect on the value of the Peanut Butter Trade Dress as an indicator of trade source. Such use undermines the association between the Peanut Butter Trade Dress and the KRAFT brand ...
>
> 10. We have recently become aware that Bega may be intending to continue using the Peanut Butter Trade Dress after December 31, 2017.
>
> 11. Section 3.5 of the [master agreement] provides that: "Except as contemplated above in this Section 3.5, all use of a Licensed Trademark by the Licensee shall cease upon the termination or expiration of the licence of such Licensed Trademark". (emphasis in the original letter).

- 11 -

12. Bega's continued use of the Peanut Butter Trade Dress after December 31, 2017, would, subject to the limited trade out period permitted under Section 3.5(a), constitute a breach of Bega's obligations under that section to cease use of all licensed marks after that date. Further, such use would be likely to mislead or deceive consumers into believing that Bega's peanut butter is actually KRAFT peanut butter, or that the peanut butter is otherwise associated with the owner of the KRAFT brand. This constitutes misleading and deceptive conduct and would be unlawful under the Australian Consumer Law.

13. Bega's continued use of the Peanut Butter Trade Dress following expiration of the license on December 31, 2017, will cause a substantial loss and damage, including damage to our goodwill and reputation in the Peanut Butter Trade Dress and the KRAFT mark, as well as preventing or impeding our market entry in Australia in January 2018. The damage to the goodwill value of the Peanut Butter Trade Dress would be even greater if Bega were to use the Peanut Butter Trade Dress in conjunction with the mark BEGA, compared to THE GOOD NUT which might well be perceived by consumers to be a descriptive term.

14. In light of the above, we request that Bega undertaking writing, on or before October 2, 2017, that:

a. Bega will not, after December 31, 2017, use the Peanut Butter Trade Dress in connection with the sale of peanut butter in Australia, except as permitted under the "trade out" provisions of Section 3.5(a);

b. Bega will not represent to its customers or potential customers that it is entitled to use the Peanut Butter Trade Dress after December 31, 2017, except as permitted under the "trade out" provisions of Section 3.5(a).

...

15. The dispute resolution process provides for initial negotiations and mediation and, if the dispute remains unresolved, arbitration proceedings in New York ...

16. As the dispute remains unresolved, we wish to move forward with the dispute resolution procedures under the [master agreement] ...

17. Please advise whether you have any preference in relation to the selection of possible mediators. We will shortly advise you of our selection. If the dispute is not resolved within 45 days of the date of this letter, we reserve our right to commence arbitration proceedings against Bega under Section 7.5 of the [master agreement].

41    Bega responded on 5 October 2017, by its Australian solicitors, asserting that "[a]s Bega ... is not a party to the [master agreement], Bega ... is not aware of any basis on which it is required to comply with the dispute resolution provisions of that Agreement ..."

*Kraft commences proceedings in the United States District Court for the Southern District of New York seeking to compel Bega to mediate and arbitrate*

42    Bega's assertion that it was not bound by the dispute resolution provisions of the master agreement prompted Kraft, on 20 October 2017, to commence a proceeding in the United States District Court seeking to compel Bega to mediate and arbitrate under the dispute

- 12 -

resolution provisions of the master agreement.  In its Petition to Compel Mediation and Arbitration, Kraft summarised the basis for the petition in these terms:

1. This petition seeks to compel Bega to participate in mediation and arbitration, as mandated by the arbitration clause in the [master agreement], so that Kraft may halt Bega's blatant violation of Kraft's intellectual property rights and prevent further injury to the world-famous KRAFT brand ...

2. Kraft and Bega are parties to [the master agreement] pursuant to which Kraft licenses to Bega (as assignee from the original licensee) the right to use the KRAFT trademark and related trade dress in connection with certain products in certain territories. In direct contravention of the [master agreement], Bega is using Kraft's distinctive trade dress separate and apart from the KRAFT trademark, and has indicated that it intends to continue using Kraft's distinctive trade dress even after the expiration of the [master agreement] at the end of this year, all in a deliberate effort to trade off the goodwill of the KRAFT brand, cause consumer confusion, and irreparably harm the value of Kraft's intellectual property.

3. The [master agreement] contains a broad arbitration clause that requires that all disputes arising out of or relating to the agreement must be resolved by mediation and arbitration in New York, and that all such disputes shall be governed by New York law.

4. Kraft recently informed Bega that it was initiating the dispute resolution process under the agreement's arbitration clause, with the initial step being to resolve the dispute by mediation and then, if necessary, by binding arbitration in New York. In response, Bega did not dispute that it was assigned and has assumed the rights of the original licensee, but nonetheless informed Kraft that it believes it is not obligated to comply with the dispute resolution provisions of the [master agreement] ...

5. Accordingly, Kraft brings this action, pursuant to the Federal Arbitration Act ... to enforce its contractual rights against Bega, and respectfully requests that this Court enter an order as soon as possible (1) declaring that Bega is bound by the terms of the [master agreement], including the arbitration clause, and (2) compelling Bega to participate in mediation and arbitration as required by the arbitration clause ...

43    On 9 November 2017, Bega's New York attorneys wrote to Judge Ramos and Kraft, confirming that Bega had acquired certain rights from Mondelez, including certain trademark rights that Kraft had licensed to Mondelez pursuant to the master agreement.  Bega's attorneys said that Bega had not unequivocally refused to participate in the dispute resolution process set forth in the master agreement, and that it was willing to do so, without waiving any rights that it may have to contest arbitrability.  On that basis, Bega said that Kraft's petition should be dismissed.

44    The proceeding came before Judge Ramos for a conference on 1 December 2017. The attorney for Kraft said, among other things, that it was for the United States District Court to decide whether the dispute the subject of Kraft's notice of dispute dated 27 September 2017

is subject to the arbitration clause contained in the master agreement.   The attorney representing Bega told the Court that "[a]s assignees, there was a question that was raised initially in Australia when the notice of dispute were sent to my client about whether they were bound.  They said it's not clear to us because we are not parties that we are bound by this provision … We have advised our client that under New York law that provision applies".  Bega's attorney suggested to the Court that the matter should be put over for 45 days, so that, as Bega's attorney said, "[i]f at the point at which the mediation is unsuccessful, and I hope it is not, there is an issue about whether we are doing what the agreement requires, we could come back then.  It just seems like nobody's time is well spent by pursuing this now".  After further discussion, Kraft's petition was adjourned until 12 December 2017.

45      Bega filed its defence on 8 December 2017.   Bega said that Kraft was mistaken in its submission that it was for the Court to determine the issue of arbitrability; that it was for the arbitration panel to determine issues of arbitrability; that Bega had not refused, and was not refusing, to comply with the dispute resolution procedure contained in the master agreement; that Kraft was, therefore, not aggrieved; and that the petition should thus be denied.

46      Kraft filed a reply on 11 December 2017 insisting that it was entitled to an order compelling Bega to participate in mediation and arbitration as required by the master agreement.

47      The matter came back before Judge Ramos for a conference on 12 December 2017.  At that hearing Judge Ramos asked the attorney for Bega: "Are you, or are you not, willing to abide by the dispute resolution process in the agreement?"  Bega's attorney replied: "Your Honor, we are abiding by it. We have agreed to mediate".  The judge then asked the attorney for Bega: "In the event that mediation fails, is it your position that you will not go to arbitration even to contest the arbitrability of this issue?"  Bega's attorney replied: "We have not said that. We don't know what will happen by then, but assuming that there's no further litigation, we'll abide by the agreement, as we said we would".  The judge responded: "I don't understand what that means, 'assuming there's no further litigation'".  Bega's attorney responded: "What I have said is that Kraft has already brought litigation in Australia. I don't know what will happen at the end of the year, and it may be that something that Kraft does constitutes a waiver, but we'll deal with that when we get there. We're not at that point yet."  The judge then asked to be told about the lawsuit in Australia.  He asked: "When was that filed since we were last together? And what is that about?"  Bega's attorney responded: "Your Honor, it was actually filed around November 11th, or maybe it was November 10th, and it

- 14 -

has two prongs; it sought interlocutory relief [and] it related to some ads that Bega had that Kraft claimed were misleading, but it also alleged that Bega had appropriated Kraft's goodwill.  The interim relief part of it was resolved – the ads were removed – but Kraft has not dropped the lawsuit. So it's really litigating issues that it agreed to arbitrate".

48      Kraft's attorney submitted, to the contrary, that there had "not been any overlap of those issues between the two fora at this point".  At the end of the hearing, the attorney for Kraft suggested, and it was agreed, that the matter should be put in abeyance for 45 days, by which time it was envisaged that the parties would have mediated.  If the mediation was to prove unsuccessful then, as Kraft's attorney put it, "a demand for arbitration will have been served by one party or the other, and if Bega refuses to comply with it, we can come back before your Honor without having to restart the process from step one …"

49      The next day, Bega's attorney's wrote to Judge Ramos, copied to Kraft, relevantly stating as follows:

> This letter is written on behalf of respondent Bega … to bring a recent development to Your Honor's attention.
>
> When we appeared for argument on December 12, 2017, there was some discussion of the proceeding petitioner Kraft Foods Group Brands LLC ("Kraft") filed in federal court in Australia. I pointed out that Kraft had initially sought interlocutory relief with respect to some Bega advertising and, after Bega agreed to withdraw the advertisements, Kraft was continuing to pursue its claims for a permanent injunction and damages. Kraft's counsel took the position that "there has not been any overlap of those issues between the two fora at this point"…
>
> Earlier today (December 14 in Australia), Bega notified Kraft that it intended to seek leave to file a cross-claim in the Australian proceeding. Like Kraft's claim, Bega's proposed cross-claim relates to advertising. It does not seek a judicial determination of the trade dress issues that are the subject of the dispute the parties are about to mediate. If the Court would like to see the proposed cross-claim, we will provide it.
>
> We want to make clear that, by filing a cross-claim in the preceding Kraft initiated in Australia, Bega is not attempting to avoid the dispute resolution provision in the [master agreement]. Bega's position remains the same as it was on November 9 when it advised Kraft that, while reserving its rights, including the right to contest arbitrability, it is prepared to comply with the dispute resolution process in the [master agreement].

50      Mediation was conducted in New York on 12 January 2018 pursuant to the dispute resolution provisions of the master agreement.  It was unsuccessful.

51      The matter came back before Judge Ramos on 26 January 2018.  The attorney for Kraft told the judge that the mediation had been unsuccessful and that Kraft was in the process of finalising arbitration papers, and preparing to commence arbitration.  He also told the judge

− 15 −

that his client agreed with the attorney for Bega "that perhaps it made sense to further adjourn this matter until after they [Bega] have had a chance to receive and review those papers and figure out whether they're raising any objection to proceeding with the arbitration or not." The attorney for Bega added: "In actuality, we suggested that this conference be adjourned because there was really nothing to discuss today since we haven't seen in arbitration demand. But we don't have a problem with adjourning this until after we have had a chance to review the arbitration demand". The Court accordingly adjourned the next hearing until 9 March 2018, and has subsequently adjourned that hearing to a date to be fixed after the delivery of judgment on this application.

***Kraft commences arbitration in New York and files a notice of arbitration***

52     On 13 February 2018, Kraft commenced arbitration proceedings against Bega in New York by filing with the International Centre for Dispute Resolution a Notice of Arbitration. Kraft submits that the jurisdiction of the International Centre for Dispute Resolution is derived from section 7.3(a) of the master agreement (set out at [36] above). Relevantly, the notice of arbitration provides as follows:

> 2...In 2017, shortly before the license was to expire, Bega acquired Mondelez's limited rights under the license and therefore became bound by Mondelez's obligations. But instead of complying in good faith, Bega deliberately copied Kraft's peanut butter trade dress and made it clear that it intends to use it after the expiration of the license term, and misappropriated to itself the goodwill in the KRAFT brand through a false advertising campaign and other actions.
>
> 3...
>
> 4. Kraft brings this action to establish that: (1) it is the owner of the peanut butter trade dress; (2) Bega's use of the peanut butter trade dress after the expiration of the license constitutes a breach of the [master agreement]; (3) Bega's misuse of the trade dress prior to the expiration of the license has damaged the KRAFT brand and the trade dress and impeded Kraft's ability to enter the market, in breach of the [master agreement]; and (4) Bega's use of the peanut butter trade dress after the expiration of the [master agreement] constitutes a trade dress infringement in violation of Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).
>
> ...
>
> 21. As of the time that Kraft and Mondelez entered into the [master agreement], the Peanut Butter Trade Dress appeared as follows:

- 16 -

 

22. In or around 2015, the Peanut Butter Trade Dress was modified as follows:

 

23. Because the Peanut Butter Trade Dress was modified during the term of the license, all rights in, and goodwill associated with, modified Peanut Butter Trade Dress accrue to and are owned by the licensor – i.e., Kraft …

…

27. Following its acquisition of the Mondelez grocery business in Australia, and its assumption of the rights and obligations under the [master agreement], Bega began selling peanut butter <u>without</u> the KRAFT trademark but with trade dress that is virtually identical to the Peanut Butter Trade Dress. At first, Bega replaced the KRAFT trademark with either the words "The Good Nut" or its own trademark in combination with the words "The Good Nut." More recently, Bega has used the Bega mark alone. Moreover, Bega is now <u>after</u> the Expiration Date continuing to sell peanut butter using trade dress that is virtually identical to the Peanut Butter Trade Dress in combination with the Bega trademark. In particular, Bega has used and is continuing to use the following trade dress:

 

28. Bega's use of trade dress that is virtually identical to the Peanut Butter Trade

- 17 -

Dress, separately and apart from the KRAFT trademark (including in combination with the Bega trademark), has a significant detrimental effect on the value of the Peanut Butter Trade Dress as an indicator of trade source, undermines the exclusive association between the Peanut Butter Trade Dress and the KRAFT brand, dilutes the significance of the Peanut Butter Trade Dress as an indicator of trade origin in the minds of consumers, and adversely impacts the ability of Kraft to prevent third-party competitors from using similar trade dress. Such conduct therefore breaches Sections 3.5(b) and 3.11 of the [master agreement], and violates Kraft's exclusive IP rights.

29. Despite repeated requests from Kraft that Bega immediately halt its infringing conduct, Bega has refused to do so, in violation of Section 3.8(c) of the [master agreement]. Indeed, Bega has launched a major multi-media advertising campaign aimed at further misleading consumers and misappropriating the extensive goodwill in the KRAFT brand. Among other things, Bega's ad campaign claimed that "KRAFT peanut butter is now Bega peanut butter," and this false and misleading message was exacerbated by a Bega television commercial in which the label on a jar of peanut butter featuring the Peanut Butter Trade Dress and the KRAFT trademark was peeled off to reveal virtually identical trade dress bearing the Bega trademark. [Footnote: Kraft has filed an application in the Federal Court of Australia that seeks to halt this advertising campaign.]

53    Kraft seeks the following in the arbitration: declaratory relief, damages for breach of contract and damages for trade dress infringement under the Lanham Act.

54    In summary, the claim for declaratory relief is pleaded on the basis that, although Kraft owns all rights and interests in the Peanut Butter Trade Dress, Bega claims that it is the owner of those rights; that Kraft has suffered and will suffer harm as a result of what Kraft says is Bega's wrongful claim that it is the owner of the Peanut Butter Trade Dress; and that, accordingly, Kraft should have an arbitral award declaring that Kraft is the owner of the Peanut Butter Trade Dress. The claim for breach of contract is, in summary, founded on the allegation that Bega's appropriation of Kraft's customers and market share directly diminishes the value, reputation and goodwill of the KRAFT trademark and the Peanut Butter Trade Dress in violation of section 3.11 of the master agreement. It is further alleged that this appropriation severely impairs and aggravates Kraft's entry into the Australian market after the Expiration Date, in violation of section 3.5(b) of the master agreement. The claim under the Lanham Act repeats and re-alleges each of the allegations contained in the demand for arbitration and says further:

56. In violation of Kraft's exclusive ownership of the Peanut Butter Trade Dress, and without Kraft's authorization, Bega has used and is continuing to use trade dress that is virtually identical to the Peanut Butter Trade Dress on the same products sold in the same markets to the same consumers.

57. Bega's actions constitute the deliberate and willful infringement of Kraft's Peanut Butter Trade Dress.

58. Bega's use of virtually identical trade dress on its peanut butter is likely to cause

- 18 -

and is causing confusion, mistake or deception as to Kraft's sponsorship and/or endorsement of Bega's peanut butter product.

59. Because Bega is a former licensee, consumer confusion is presumed.

60. By reason of the foregoing, Bega's conduct constitutes a violation of Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).

61. Bega's infringement of the Peanut Butter Trade Dress has caused, and will continue to cause, ongoing and irreparable injury to Kraft's intellectual property, reputation and goodwill.

55    The prayer for relief contains, in addition to a request for a declaration of the type set out above, a request for an arbitral award enjoining Bega, preliminarily and permanently, from any further use of the Peanut Butter Trade Dress or any confusingly similar trade dress and for damages.

### *Kraft files a notice of application for emergency relief*

56    On the same day, Kraft filed in the arbitration a Notice of Application for Emergency Relief, seeking an order immediately enjoining Bega during the pendency of the arbitration from (1) any further use of the peanut butter trade dress or any confusingly similar trade dress; and (2) any conduct aimed at delaying or impairing Kraft's ability to re-enter the Australian market for peanut butter.

57    Kraft also filed a declaration from its chief counsel in support of the application, declaring, among other things, that Bega had engaged in "delaying tactics," and that the alleged reason for having done so was this:

> 13. … During the pendency of the petition to compel arbitration, Bega launched a major multi-media advertising campaign aimed at further misleading consumers and misappropriating the extensive goodwill in the KRAFT brand. Among other things, Bega's ad campaign claimed that "KRAFT peanut butter is now Bega peanut butter," and this false and misleading message was exacerbated by a series of Bega television commercials in which the label on a jar of peanut butter featuring the Peanut Butter Trade Dress and the KRAFT trademark was peeled off to reveal virtually identical trade dress bearing the Bega trademark. [Footnote: Kraft has filed an application in the Federal Court of Australia seeking to hold this advertising campaign, and is seeking damages and other relief, including corrective advertising].

### *Bega obtains an ex parte order in this proceeding staying the arbitration*

58    Prompted by Kraft's application, Bega immediately filed an interlocutory application in this proceeding seeking an ex parte interim injunction restraining Kraft from, among other things, taking any step in the arbitration.  On 16 February 2018, after hearing counsel for Bega's submissions, I made an interim order on that day restraining Kraft from taking any step in

- 19 -

arbitration proceedings and from taking any other step to seek to restrain this proceeding until further order.

**This proceeding**

59   The advertisements the subject of this proceeding were first broadcast on television and on radio on 22 October 2017, two days after Kraft commenced the proceeding in the United States District Court. Kraft commenced this proceeding on 9 November 2017, approximately three weeks before the first hearing before Judge Ramos. It filed an Amended Statement of Claim on 22 November 2017. Bega filed its defence on 4 December 2017. Kraft filed its Reply to that defence on 12 December 2017, which was the same day of the second conference before the United States District Court. On 15 December 2017, Bega filed a Cross–Claim in this proceeding. Kraft filed its Defence to the Cross–Claim on 2 February 2018. The second case management hearing of this proceeding was conducted before me on 9 February 2017. Four days after that, Kraft commenced the arbitration.

*The pleadings filed in this proceeding: Schedule A*

60   Because the parties are at odds about whether the two proceedings involve substantially similar issues (as Bega contends) or have nothing to do with each other (as Kraft contends), it is necessary to set out in more detail than might otherwise be expected the relevant parts of the pleadings filed in this proceeding. Because of their length, the pleadings are to be found in the schedule to these reasons (marked Schedule A).

**Do the two proceedings overlap?**

*Relevant principles*

*CSR Ltd v Cigna Insurance Australia Ltd (1997) 189 CLR 345*

61   A court's power to prevent its processes being abused, or interfered with, authorises the grant of anti-suit injunctions. As the High Court explained in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 391–392 (per Dawson, Toohey, Gaudron, McHugh, Gummow and Kirby JJ):

> The counterpart of a court's power to *prevent* its processes being abused is its power to *protect* the integrity of those processes once set in motion. And in some cases, it is that counterpart power of protection that authorises the grant of anti-suit injunctions. Thus, for example, if "an estate is being administered ... or a petition in bankruptcy has been presented ... or winding up proceedings have been commenced ... an injunction [may be] granted to restrain a person from seeking, by foreign proceedings, to obtain the sole benefit of certain foreign assets". Similarly, as

- 20 -

> Gummow J pointed out in *National Mutual Holdings Pty Ltd v The Sentry Corporation* (1989) 22 FCR 209 at 232, a court may grant an injunction to restrain a person from commencing or continuing foreign proceedings if they, the foreign proceedings, interfere with or have a tendency to interfere with proceedings pending in that court.

62    The power to grant anti-suit injunctions is not confined to defined and closed categories. "Rather, it is to be exercised when the administration of justice so demands or, in the context of anti-suit injunctions, when necessary for the protection of the court's own proceedings or processes": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 392.

63    The phrase anti-suit injunction "resembles an injunction granted to protect the legal or equitable rights of the plaintiff **or** a common injunction to protect the processes of the Chancery Court against interference by the processes of other courts": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 390 (emphasis added). The power of a court to protect its own proceedings or processes by the granting of an injunction is **"quite apart"** from its power, granted in the exercise of equitable jurisdiction, to grant of an injunction to restrain "proceedings in another court, including in a foreign court, which are, according to the principles of equity, vexatious or oppressive": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 392-393 (emphasis added).

64    It is, therefore, critical to keep in mind the distinction between injunctions granted in exercise of the inherent power (or implied power as it is called in this court: see below) and those granted in the exercise of equitable jurisdiction.

65    The first important distinction is that when the equitable ground is sought to be invoked, one central question that arises is which court or tribunal should hear and determine the relevant matter. This includes asking whether the Australian forum is, or is not, a clearly inappropriate forum. Conversely, when the injunction is sought to protect the proceedings or processes of a court, no question arises as to whether the Australian court is an appropriate forum because "it is the only court with any interest in the matter": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 398.

66    The second important distinction is that proceedings "are to be viewed as vexatious or oppressive only if there is nothing which can be gained by them over and above what may be gained in local proceedings": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 393.

- 21 -

67    As the High Court explained in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR
345, 394:

> Given that, in England, the power to grant injunctions has for many years been
> conferred by statute, it is not surprising that the cases decided in that country in
> recent years do not make a clear distinction between injunctions granted in exercise
> of the inherent power and those granted in the exercise of equitable jurisdiction.
> However, the older cases referred to in *Société Aerospatiale* [v *Industrielle
> Aerospatiale v Lee Kui Jak* [1987] AC 871] make it abundantly clear that the power
> to stay foreign proceedings which are vexatious or oppressive, in the sense already
> described, is a power which derives from equity.
>
> Because the power to grant injunctions in respect of foreign proceedings which are
> vexatious or oppressive, in the sense described, derives from equity, it is not to be
> confined to the examples found in the decided cases. Rather, it is a power the limits
> of which are determined by the dictates of equity and good conscience. Thus, for
> example, it may be that the bringing of proceedings with respect to one claim is
> properly to be seen, in the circumstances of the case, as an election either not to
> proceed on another claim or not to proceed in another jurisdiction, thus giving rise to
> an estoppel by conduct such that it would be unconscionable for that other claim to
> be pursued or for proceedings to be commenced in another jurisdiction. In cases of
> that kind an injunction may issue in restraint of the subsequent proceedings.
>
> (Footnotes omitted).

*Nomenclature: implied power, not inherent power, in the Federal Court of Australia*

68    The power of the Federal Court of Australia to grant injunctive relief (including an anti-
arbitration injunction) is undoubted, although this court avoids the use of the term "inherent
jurisdiction" because it is a statutory court.  As Deane J explained in *Jackson v Sterling
Industries Limited* (1987) 162 CLR 612, 623:

> To some extent, the general power of the English High Court of Justice to grant a
> Mareva injunction was initially seen as based on the provisions of s. 45(1) of the
> *Supreme Court of Judicature (Consolidation) Act* 1925 (U.K.): see also the *Supreme
> Court Act 1981* (U.K.), s 37(3). That general power should, however, now be
> accepted as an established part of the armoury of a court of law and equity to prevent
> the abuse or frustration of its process in relation to matters coming within its
> jurisdiction. That being so, the power to grant such relief in relation to a matter in
> which the Federal Court has jurisdiction is comprehended by the express grant to that
> court by s. 23 of the *Federal Court of Australia Act* of power, in relation to such
> matters, "to make orders of such kinds, including interlocutory orders, and to issue,
> or direct the issue of, writs of such kinds, as the court thinks appropriate". Indeed,
> even in the absence of the provisions of s. 23, the Federal Court would have
> possessed power to make such orders in relation to matters properly before it, as an
> incident of the general grant to it as a superior court of law and equity of the
> jurisdiction to deal with such matters. In that regard, I agree with the following
> comments of Bowen C.J. in his judgment in the present matter ((1986) 69 ALR 92 at
> 97):
>
> > "In relation to a statutory court such as the Federal Court it is wise to avoid
> > the use of the words 'inherent jurisdiction'. Nevertheless a statutory court
> > which is expressly given certain jurisdiction and powers must exercise that

- 22 -

> jurisdiction and those powers. In doing so it must be taken to be given by implication whatever jurisdiction or powers may be necessary for the exercise of those expressly conferred. The implied power ... to prevent abuse of its process, is similar to, if not identical with, inherent power."

See also *DJL v The Central Authority* (2000) 201 CLR 226, 241 at [25]-[26] per Gleeson CJ, Gaudron, McHugh, Gummow and Hayne JJ ("A court exercising jurisdiction or powers conferred by statute has powers expressly or by implication conferred by the legislation which governs it and this is a matter of statutory construction; it also has in addition such powers as are incidental and necessary to the exercise of the jurisdiction or the powers so conferred. It would be inaccurate to use the term 'inherent jurisdiction' here and the term should be avoided as an identification of the incidental and necessary power of a statutory court" (citations and internal quotations omitted)); *Hogan v Hinch* (2011) 243 CLR 506, 531 at [21] (per French CJ).

*Scope of relevant issues includes all pleaded matters*

69    In assessing whether, and if so, to what extent, the issues in the two proceedings overlap, the scope of the relevant issues necessarily includes all the issues raised by the parties, including by Bega in its defence and counterclaim, and by Kraft in its statement of claim, reply and defence to counterclaim. That is so because when a foreign party brings a proceeding in an Australian court, it submits not only to its jurisdiction in respect of its own action, but also in respect of any cross-claim that a respondent brings: *Marlborough Harbour Board v Charter Travel Co* (1989) 18 NSWLR 223, 232G; *National Commercial Bank v Wimborne* (1979) 11 NSWLR 156, 169B-174G. The notion that the relevant dispute includes all such matters is also consistent with the principle that, when a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case: *Henderson v Henderson* (1843) 3 Hare 100 at 115; 67 ER 313, 319, cited with approval by the High Court in *Port of Melbourne Authority v Anshun Pty Ltd* (1981) 147 CLR 589, 598. It also reflects the fact that when proceedings are commenced in a Chapter III Court, and the court is seised of a "matter" within the meaning of ss 75 or 76 of the Constitution, such a matter includes all controversies arising out of a common sub-stratum of facts: *Fencott v Muller* (1983) 152 CLR 570, 607 per Mason, Murphy, Brennan and Deane JJ. As the High Court in that case went on to explain at 608:

> In identifying a s. 76(ii) matter, it would be erroneous to exclude a substantial part of what is in truth a single justiciable controversy and thereby to preclude the exercise

- 23 -

of judicial power to determine the whole of that controversy. What is and what is not part of the one controversy depends on what the parties have done, the relationships between or among them and the laws which attach rights or liabilities to their conduct and relationships. *The scope of a controversy which constitutes a matter is not ascertained merely by reference to the proceedings which a party may institute, but may be illuminated by the conduct of those proceedings and especially by the pleadings in which the issues in controversy are defined and the claims for relief are set out.* But in the end, it is a matter of impression and of practical judgment whether a non-federal claim and a federal claim joined in a proceeding are within the scope of one controversy and thus within the ambit of a matter.

(Emphasis added)

See also s 22 of the *Federal Court of Australia Act 1976* (Cth): "The Court shall, in every matter before the Court, grant, either absolutely or on such terms and conditions as the Court thinks just, all remedies to which any of the parties appears to be entitled in respect of a legal or equitable claim properly brought forward by him or her in the matter, so that, as far as possible, all matters in controversy between the parties may be completely and finally determined and all multiplicity of proceedings concerning any of those matters avoided".

### Consideration

70    Bega contends that an anti-arbitration injunction should go because:

    (a)    in the exercise of the court's implied power, the arbitral proceeding will interfere with, or will have a tendency to interfere with, this proceeding and the court's processes; and/or

    (b)    in the exercise of the court's equitable jurisdiction, to permit the arbitral proceeding to continue would be, according to the principles of equity, vexatious or oppressive.

71    Kraft submits the opposite. It says that the proceeding that it initiated and continues to prosecute in this court, and to which Bega has responded, including by counterclaim, "relates to an entirely different issue from the subject of the [a]rbitration".

72    In my view, there is a substantial degree of overlap between the two proceedings. My reasons are as follows.

73    The pleadings exchanged by the parties in this proceeding make it sufficiently clear that a central issue to be determined at trial is the ownership of the goodwill in the "packaging and get-up" (as it is referred to in the pleadings in this proceeding) or the "trade dress" (as the packaging and get-up is referred to in the notice of arbitration). That question, on the

- 24 -

pleadings, in turn depends upon whether all the goodwill at all times emanated, and continues to emanate, from the master agreement, and thus belongs to Kraft, as it contends (see, in particular, Kraft's reply at 10(c)), or whether, at least since October 2012, by reason of the various matters pleaded by Bega in its defence, including in particular paragraphs [28], [30], [34], [38] and [39], Kraft does not own any of the goodwill in Australia generated in respect of the sale of peanut butter in Australia since 2012, including "sales made by reference to the packaging and get-up, including the yellow lid, clear container, and predominantly yellow label" (see, for example, Bega's defence at [40]).

74     Bega's plea at paragraph [40] of its defence that Kraft does not own any of the goodwill in Australia generated in respect of the sale of peanut butter in Australia since 2012, including "sales made by reference to the packaging and get-up, including the yellow lid, clear container, and predominantly yellow label", involves, on the face of the pleadings, the same issue that lies at the heart of the case that Kraft seeks to make in the arbitration – namely, that "Bega deliberately copied Kraft's peanut butter trade dress and made it clear that it intends to use it after the expiration of the licence term, and **misappropriated to itself the goodwill in the KRAFT brand through a false advertising campaign and other actions**" (see notice of arbitration at [2]) (emphasis added).

75     Further, Kraft expressly joins issue in its reply with Bega's allegations in [40] of its defence and also with those in [28], [30], [34], [38] and [39] of Bega's defence. I will not repeat the paragraphs of Kraft's reply. They are set out in Schedule A. I agree with the submission of Dr AS Bell SC, who with Mr C Smith appeared on behalf of Bega, that "the difference between the parties [on the pleadings] is that we say it was Mondelez's own goodwill, which it assigned to us and is now our goodwill, but it didn't have its origin in the licence agreement. Kraft says it did. We say it didn't. That's … the issue broadly put, in the New York arbitration, because the breach of the licence agreement in the New York arbitration is based upon the assertion that goodwill in relation to the trade dress derives from the licence agreement".

76     Further, both the notice of arbitration and the pleadings filed in this proceeding, in significant part, concern the allegation by Kraft that the advertisements display the peanut butter get-up, or trade dress, over which Kraft claims ownership. Put another way, as counsel for Bega put it in their written submissions in reply: "[i]t is impossible to separate the 'trade dress' from the allegations of misleading or deceptive conduct" in this proceeding because "[t]he conduct

- 25 -

constituted by the advertisements which is said to be misleading necessarily includes the central images that they contain".

77   Mr de Souza deposed in his affidavit sworn on 9 November 2017 at [22] in support of Kraft's application for interlocutory relief (which was adjourned): "The overall get-up and look of Bega's peanut butter products is strikingly similar to the iconic Kraft peanut butter trade dress comprising a yellow lid and yellow label with red or blue peanut device that is brown-coloured when filled". It is that very get-up, or trade dress, that is the centrepiece of the television advertisements that are the subject of the claim made under the Australian Consumer Law by Kraft in this proceeding. As Mr de Souza swore: "... the Advertisements represent a direct transition from peanut butter labelled with the Kraft brand to peanut butter labelled Bega". He said that the direct transition was "particularly striking in the Bega Television Advertisement [as defined in the Statement of Claim], where the presenter peels the label off a jar of Kraft peanut butter to reveal a Bega label". Mr de Souza's affidavit included "stills" from that advertisement showing the peeling of the Kraft label to reveal the Bega label as follows:



78   Before leaving this issue, I should mention one other point raised by Mr DJ Batt QC, who, with Mr IP Horak, appeared for Kraft. He submitted that the issues cannot overlap because

- 26 -

the trade dress does not, and cannot, feature in the pleaded radio advertisement. That submission, it seems to me, has a touch of "the tail wagging the dog" about it. In any event, it can only go to the degree of overlap. In my view, even having regard to Mr Batt's point, there is nonetheless, for the reasons I have given, a substantial degree of overlap between the pleaded case in this proceeding about the television advertisements and the trade dress claim in the arbitration.

79  For each of those reasons, in my view, the question of the ownership of the packaging, get-up (trade dress) is, on the pleadings in this proceeding, central to the question of whether all, or some, of the pleaded representations are false or misleading within the meaning of s 18 of the Australian Consumer Law. That question is also the central issue raised in the notice of arbitration. For those reasons, if both the arbitration and this proceeding run there will, in my view, be a real risk of inconsistent findings on the critical question of who owns the goodwill in the packaging/get-up/trade dress. I return to that issue later in these reasons.

**Was Kraft precluded by the dispute resolution clause in the master agreement from seeking to arbitrate its s 18 Australian Consumer Law claim?**

80  I turn now to Kraft's contentions that the causes of action the subject of this proceeding do not "arise out of or relate to" the master agreement; that conduct of the kind proscribed by the Australian Consumer Law will be established, if at all, irrespective of the contractual relations of the parties; that the master agreement is "mere background"; and that, therefore, the dispute the subject of this proceeding was properly brought in this court and was never intended by the parties to the master agreement to be the subject of arbitration. If Kraft's contention that the causes of action the subject of this proceeding do not "arise out of or relate to" the master agreement, it would follow that injunctive relief should not be granted.

81  Bega did not press a case that the dispute the subject of this proceeding "arises out of" the master agreement. It submits, however, that it "relates to it".

82  The phrase "relates to" is obviously one of wide import and is not to be read down. See *IBM Australia Ltd v National Distribution Services Ltd* (1991) 22 NSWLR 466, 475F-477D, 483, 487; *Exford Pines Pty Ltd v Vlado's Pty Ltd* [1992] 2 VR 449, 451-452; *Fitzpatrick v Emerald Grain Pty Ltd* [2017] WASC 206 at [49].

83  Kraft's Amended Statement of Claim (set out in Schedule A of these reasons) expressly pleads the master agreement. It pleads that, by the terms of the master agreement, Kraft has,

since 4 July 2017, exclusively licensed Bega to use the Kraft Brand in Australia in respect of various goods including peanut butter spread, which it defines as "the Licence".  It is then alleged that the Licence ceased on 31 December 2017 and that Bega now has no right to use the Kraft Brand.

84     If that were as far as it went, Kraft's contention that the master agreement is pleaded by way of mere background might have some force.  But the pleading goes much further, and, as counsel for Bega put it, goes on expressly to tie the pleaded allegations of falsity to the legal life and impact of the master agreement; what did or did not turn on the end of the master agreement; and what did or did not turn on what was said about trade origin.

85     A few examples will suffice.

86     The first pleaded representation is that "Kraft peanut butter is now Bega peanut butter or is being replaced by Bega peanut butter".  It is said that that representation is false, misleading or deceptive because Kraft peanut butter has not changed its name to Bega peanut butter, and is not being replaced by Bega peanut butter, but rather Kraft peanut butter will retain its name and continue to be sold in Australia under that name.  That can only be so by virtue of the relevant terms of the master agreement.

87     The third pleaded representation is that "the Kraft Brand has ceased to exist or is ceasing to exist in relation to peanut butter".  It is said that that representation is false, misleading and deceptive or likely to be so in that the Kraft Brand has not ceased to exist and is not ceasing to exist, but will continue to be used in the marketplace in relation to peanut butter and other products. Again, that can only be so by virtue the relevant terms of the master agreement.

88     The fifth pleaded representation is that the only difference between Kraft peanut butter and Bega peanut butter is the name.  It is said that that representation is false, misleading and deceptive or likely to be so in that the end of Bega's licence to use the Kraft Brand is not a mere name change, but rather is a fundamental change to the trade origin and potentially the quality of peanut butter sold by Bega.  That plea expressly ties the allegation of falsity to the end of the licence -- an "end" which, as pleaded by Kraft, is brought about by the terms of the master agreement.

89     Mr de Souza in his 9 November 2017 affidavit also swears in respect of the fifth representation pleaded that: "[t]he end of Bega's licence to the Kraft brand represents much more than a mere name change.  As licensee of the Kraft brand, Bega is subject to obligations

- 28 -

under the [m]aster [a]greement in relation to product quality. Those obligations do not apply in relation to products branded under Bega's own trademarks and which do not feature the Kraft brand" (emphasis added). That is another basis upon which it can be said to be clear that Kraft's case seeks (as it seems to me it must seek) to tie the falsity of pleaded representation to the meaning and effect of the master agreement for which it contends.

90      Counsel for Kraft relied on the following passage from the judgment of Beaumont J in *Allergan Pharmaceuticals Inc v Bausch & Lomb* [1985] ATPR 40-636 (**Allergan**), 47173-47174 in support of the proposition that the master agreement is mere background to the Australian Consumer Law claim and that the claim does not "relate to" the master agreement (and is thus not arbitrable):

> For those reasons, in my opinion, a stay of proceedings should be granted so far as they involve claims for relief for breach of contract. The respondents further seek a general stay. Such a stay can, in my view, only be granted if the remaining claims for relief fall within the provisions of sec. XIX of the Agreement. The phrase in that reference "arising out of or relating to (the) Agreement" is, it is true, capable of the widest construction (see *Heyman v. Darwins Limited* (1942) AC 356 at p 366 and *Fountain v. Alexander* (1982) 150 CLR 615 at p 629). But can it be said that the applicants' claims that the several provisions of the *Trade Practices Act* have been contravened are referable to arbitration under this clause? In my opinion, those claims fall outside the purview of that clause. In my view, causes of action in the form of contraventions of ss.52, 53(a), 53(d) or 53(g) arise exclusively from the statutory provisions themselves. It is trite to say that causes of action under the general law, whether in contract or otherwise, arise independently of these provisions. In the absence of any substantive nexus or connection between the contract sued upon and the contraventions of the several provisions of Part V of the *Trade Practices Act* alleged, and, in my view, none exists here, the latter causes of action cannot be referable to arbitration pursuant to sec. XIX.
>
> In my opinion, it is not enough for this purpose to point to the contract as part of the background to these alleged contraventions. As has been said, the statutory causes of action now sued upon exist independently of contract. They are consumer protection provisions which in no way depend upon any private agreement for their source. Conduct of the kind proscribed by Part V of the Trade Practices Act will be established, if at all, irrespective of the contractual relations of the immediate parties. Nor could any contract *inter partes* constitute a defence to any alleged contravention of such legislation. In short, an alleged contravention of Part V of the *Trade Practices Act* is not, as a matter of characterisation, a "controversy or claim arising out of or relating to (the) Agreement" for the purposes of sec. XIX of that contract…

91      It is clear from these passages, however, that although as a general matter "[i]t is trite to say that causes of action under the general law, whether in contract or otherwise, arise independently of" statutory consumer protection provisions contained in the Australian Consumer Law (and before it the *Trade Practices Act 1974* (Cth)), whether or not in any given case a pleaded cause of action invoking the Australian Consumer Law may be said to

- 29 -

be "in relation to" a contract between the same parties will depend upon whether there exists a "substantive nexus or connection between the contract sued upon [here, the master agreement] and the contraventions of the ... [Australian Consumer Law] alleged". No such nexus or connection existed in *Allergan*, as Beaumont J expressly found. In this case, however, such a nexus or connection between the master agreement and the contraventions of the Australian Consumer Law alleged is apparent on the face of Kraft's own pleading.

92    In any event, the passages from the judgment of Beaumont J in *Allergan* on which Kraft relies must now be read in light of many cases decided since. *Allergan* was, for example, decided before the decisions of the New South Wales Court of Appeal in *IBM Australia Ltd v National Distribution Services Ltd* (1991) 22 NSWLR 466 and *Francis Travel Marketing Pty Ltd v Virgin Atlantic Airways Ltd* (1996) 39 NSWLR 160, which, along with a number of other more recent decisions, make it clear that the correct general approach to the construction of arbitration clauses is "that sensible parties do not intend to have possible disputes that may arise heard in two places": *Hancock Prospecting Pty Ltd v Rinehart* (2017) 350 ALR 658; [2017] FCAFC 170, 709 at [193]. See also *Jasmin Solar Pty Ltd v Trina Solar Australia Pty Ltd* (2015) 331 ALR 108; [2015] FCA 1453, 132 at [147] per Edelman J ("The decision in *Allergan* involved a close examination of the particular circumstances of that case. However, since the decision there has been a stronger emphasis on the principle that arbitration agreements should be construed with a broad, liberal, and flexible approach ..."). As French CJ and Gageler J put it in *TCL Air Conditioner (Zhongshan) Co Ltd v The Judges of the Federal Court of Australia* (2013) 251 CLR 533, 550 at [16]: "... parties who enter into an arbitration agreement for commercial reasons ordinarily intend all aspects of the defined relationship in respect of which they have agreed to submit disputes to arbitration to be determined by the same arbitral tribunal" (citing *Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* (2006) 157 FCR 45, 87-93 at [162]-[187]; *Fiona Trust & Holding Corporation v Privalov* [2007] 4 All ER 951, 956-958 at [5]-[14]).

93    As Clarke JA (with whom Handley JA agreed) in *IBM Australia Ltd v National Distribution Services Ltd* (1991) 22 NSWLR 466 at 483B-F said of the arbitration clause in that case (viz, "[a]ny controversy or claim arising out of or related to this agreement or the breach thereof will be settled by arbitration"):

> The phrases "in relation" to or "related to" are of the widest import and should not, in the absence of compelling reasons to the contrary, be read down ... In its context I would, in the absence of contrary indications in the contract, understand the clause to

- 30 -

be sufficiently wide to encompass claims that pre-contractual misrepresentations induced the complaining party to enter the contract.

There are no indications in the contract that the words should be construed narrowly. Nor, in my opinion, are there any compelling reasons in favour of reading down the meaning of the phrase. On the contrary there are powerful considerations in favour of the contrary view. The consequence of an interpretation of the arbitration clause which excludes the claims under the Act would be that the causes of action based upon breaches of the contract would remain with the arbitrator, and be decided by him, and those in which reliance were placed upon ss 52, 82 and 87 of the Act would be determined in a court of law. As I earlier pointed out this conclusion would follow even in a case in which the same representations were said to ground claims in breach of contract and under the Act.

The parties could hardly be thought to have contemplated that the arbitration clause would work in that way. It is far more likely that they intended that all disputes between them concerning the terms of the contract, the performance of it and matters connected, in a real sense, with the contract should be referred to the one tribunal for determination. For my part I would find it difficult to ascribe to the parties to a contract an intention to submit only part of a dispute to an arbitral tribunal reserving the remainder for consideration by the Court as this would, on any view, be inefficient and costly.

94    Further, as the Full Court said in *Hancock Prospecting Pty Ltd v Rinehart* (2017) 350 ALR 658; [2017] FCAFC 170, 709 at [193], arbitration clauses are not to be construed by "engag[ing] in semantic debates about relational prepositional phrases capable of throwing up fine distinctions, often based on the temporal or visual metaphor from the language "under", "arising under", "out of", "arising out of", "in relation to" and "in connection with". Context will almost always tell one more about the objectively intended reach of such phrases than textual comparison of words of a general relational character. None of the phrases is linguistically stable or fixed".

95    In this case, there are no indications that the phrase "in relation to" in the context of the master agreement should not be given its widest import. There is, in my view, no reason why the parties to the master agreement are to be taken to have intended to exclude from the arbitration clause claims brought pursuant to consumer protection provisions of the Australian Consumer Law which allege that Bega made false or misleading representations about, among other things, whether Bega peanut butter is replacing Kraft peanut butter, whether Kraft peanut butter will continue to be sold in Australia and about the legal consequences of the termination of Bega's licence under the master agreement. In my view, it is wrong to say that such claims do not "relate to" the master agreement. Those representations can only be false or misleading (if that is what they are) by virtue of the operation and effect of the relevant terms of that agreement.

- 31 -

96    In my view, for those reasons, Kraft's pleaded case in this proceeding is one in which it seeks
to agitate a dispute which is properly to be characterised as being "in relation to" the master
agreement.  For that reason, in my view, Kraft should have invoked the dispute resolution
provisions of the master agreement with respect to the claims made in this proceeding.  It was
not, as it contended, bound to bring the proceeding in this court.

### Should an anti-arbitration injunction go?

#### *Implied (inherent) power*

97    I turn first to consider Bega's case that an anti-arbitration injunction should be granted to
protect the integrity of the court's proceedings or processes: *CSR Ltd v Cigna Insurance
Australia Ltd* (1997) 189 CLR 345, 392.

98    Mr Batt, on behalf of Kraft, accepted that the same broad principles applicable to anti-suit
injunctions generally apply in respect of anti-arbitration injunctions.  He agreed that, although
there is no "separate stream of principles" that apply to anti-arbitration injunctions, they
nonetheless "fall to be applied through a different prism and with extra caution".  In that
regard he relied on the judgment of Hamblen J in *Claxton Engineering Services Limited v
TXM Olaj-Es Gazkutato Ktf* [2011] EWHC 345 (Comm) at [30] and [32] respectively for the
propositions that:

    (1)   in approaching the exercise of a discretion to enjoin an international arbitration, courts
should enjoin such an arbitration only in "exceptional" circumstances "consistent[ly]
with the doctrine of Kompetenz-Kompetenz and with the principles of law of
international arbitration, agreed under the New York Convention ..."; and

    (2)   "[t]he need for caution in the grant of such injunctions is all the greater in relation to
arbitrations outside the jurisdiction because such matters are generally best left to the
relevant supervisory courts being the courts of the country of the seat of the
arbitration".

99    The first of those propositions is, with respect, an incomplete statement of the position
enunciated in the English cases.  First, to say that an anti-arbitration injunction should only be
granted to restrain an international arbitration in "exceptional" circumstances does rather beg
the question of what comprises "exceptional" circumstances.  In any event, as Hamblen J said
in *Claxton Engineering Services Limited v TXM Olaj-Es Gazkutato Ktf* [2011] EWHC 345
(Comm) at [34], exceptional circumstances in this context includes an applicant for an

- 32 -

injunction establishing that its "legal or equitable rights have been infringed or threatened by a continuation of the arbitration, or that its continuation will be vexatious, oppressive or unconscionable". See also *Excalibur Ventures v Texas Keystone* [2011] 2 Lloyd's Rep 289; [2011] EWHC 1624 (Comm), at [55] (per Gloster J); *AmTrust Europe Limited v Trust Risk Group SPA* [2015] EWHC 1927 (Comm) at [25] (describing the question whether the circumstances of an individual case are "exceptional" or "an exception" to a general rule as "an arid debate"). It follows that, if it were necessary to identify another category of exceptional case, it would surely include one where the court, using its inherent power, sought, by granting an injunction, to protect its own proceedings or processes.

100     In my view, there is no "different prism" to be looked through or "extra caution" to be exercised in deciding whether to grant an anti-arbitration injunction. The relevant question to be addressed is whether an anti-arbitration injunction should go, consistently with the principles enunciated by the High Court in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345. Of course, caution in the exercise of the jurisdiction to grant any injunction is always needed: *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 396. But no part of the exercise of the court's discretion on an application for an anti-arbitration injunction involves the court asking itself, or needing to determine, whether the relief claimed is "exceptional".

101     The interests of the United States District Court, and of the arbitrators (who are yet to be appointed in this case) are also not directly implicated here, because it is the impact, or potential impact, on the proceedings or processes of this court, not on the United States District Court or the arbitrators, that is said to provide a proper and sufficient basis for the court to enjoin the arbitration. As the High Court said in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 398: "[i]n cases where anti-suit injunctions are sought to protect the proceedings or processes of a court, no question arises whether that court is an appropriate forum for the resolution of that issue: it is the only court with any interest in the matter".

102     The second of the propositions upon which senior counsel for Kraft relies citing *Claxton Engineering Services Limited v TXM Olaj-Es Gazkutato Kft* [2011] EWHC 345 (Comm) is an accurate statement of the well-established general principle that the courts of the seat of the arbitration should have supervisory jurisdiction. But that principle can be displaced, or can be seen to have no relevance, in circumstances where the party moving for the injunction

- 33 -

alleges, as Bega does here, that a proper basis for the granting of such an injunction is founded upon the interference with the proceedings or processes of the court.

103   Therefore, the critical question that falls to be decided in this case is whether restraining the taking of any further steps in the arbitration is necessary for the administration of justice to protect this court's own proceedings or processes. It is to that question that I now turn.

104   In my view, this is an appropriate case for an anti-arbitration injunction to go because of the risk of inconsistent findings about what, in my view, is a question central to both proceedings, namely, the ownership of the goodwill in the packaging and get-up/trade dress. This question, as I have explained above, depends upon whether the goodwill at all times emanated, and continues to emanate, from the master agreement, and thus belongs to Kraft (as it contends) or whether, (as Bega contends) at least since October 2012, Kraft has not owned any of the goodwill in Australia generated in respect of the sale of peanut butter in Australia.

105   In *Incitec Ltd v Alkimos Shipping Corporation* (2004) 138 FCR 496, Allsop J (as the Chief Justice then was) said (508 at [62]) that "[t]he very existence of the possibility, if not probability, of duplicated litigation is, on modern authority of the highest persuasive stature a cogent consideration in assessing the effect of an exclusive jurisdiction clause". That same statement is equally applicable in assessing an arbitration clause.

106   As Allsop J explained in *Incitec Ltd v Alkimos Shipping Corporation* (2004) 138 FCR 496, 506 at [47], once a duplication between two proceedings is identified, "one has the intersection of two powerful considerations in international litigation: first, the desire of courts to hold commercial parties to their bargain ... secondly, the desire of courts to avoid disruption and multiplicity of litigation, in particular a desire to avoid parallel proceedings and the risk of inconsistent findings, and to avoid the causing of inconvenience to third parties". His Honour said (at [49]) that the important factors in weighing against the operation of an exclusive jurisdiction clause are: "(a) the inconvenience, if any, whether financial or other, caused to third parties; (b) the effect, if any, upon the due administration of justice; and (c) any other appropriate public policy consideration that can be discerned in all the circumstances".

107   Allsop J then considered a number of English cases, as follows (506-508 at [52]-[60]):

   In *The 'El Amria'* [1982] 1 Lloyd's Rep 119, the cargo interests who had agreed to

- 34 -

an exclusive jurisdiction clause with the carrier in a bill of lading also sued the relevant Harbour Board which was not bound by the clause. This arose from the carrier's plea that the deterioration of the cargo was caused because of the unreasonably slow date of discharge. Brandon LJ (as he then was) said at 128:

> I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; *rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries*. See as to this *Halifax Overseas Freighters Ltd v Rasno Export; Technoprominport*; and *Polskie Linie Oceaniczne P.P.W. (The Pine Hill)*, [1958] 2 Lloyd's Rep. 146 and *Taunton-Collins v Cromie & Others*, [1964] 1 W.L.R. 633 (emphasis added)

A stay was refused.

These views of Brandon LJ were not merely based on, or expressed as, questions of convenience. They were an expression of the deep and strong antipathy of courts for the promotion of circumstances allowing for inconsistent curial approaches to the same dispute. This can be seen in an examination of the judgment of McNair J in *The 'Pine Hill'* [1958] 2 Lloyd's Rep 146, 150-52 where McNair J spoke of the judicial system being brought into disrepute by the possibility of conflicting findings. This passage from the judgment of McNair J resonated in the reasons of Lord Denning MR in *Taunton-Collins v Cromie* [1964] 1 WLR 633, 636.

In *Citi-March Ltd v Neptune Orient Lines Ltd* [1997] 1 WLR 1367 Colman J in effect refused to enforce an exclusive Singaporean jurisdiction clause. Of great significance was the fact that the litigation would be split. ... Colman J not only looked at the injustice to the parties but also the public policy involved in inconsistent findings: 1375 and 1376. Colman J referred to and relied on what Brandon LJ had said in *The 'El Amria'*.

A year later, Rix J in *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd* [1997] 1 Lloyd's Rep 566 referred with approval to *Citi-March*.

A concern for the importance of avoiding inconsistent findings can be seen in the judgments in the Court of Appeal in *Bouygues Offshore SA v Caspian Shipping Co (Nos 1, 3 4 and 5)* [1998] 2 Lloyd's Rep 461 at 470 per Sir John Knox ...

All these cases were reviewed by the House of Lords in *Donohue v Armco*. Lord Bingham also referred to the procedurally complex decision of Rix J in *Crédit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767, where orders were made which contemplated fragmented litigation. Lord Bingham noted, however, at [2002] 1 Lloyd's Rep at 434-35, that it was not possible for Rix J to make an order ensuring a trial in one forum. At 436 Lord Bingham described the splitting of litigation as of "great weight". His Lordship said at 436:

> A procedure which permitted the possibility of different conclusions by different tribunals, perhaps made on different evidence, would in my view run directly counter to the interests of justice...

> In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I

- 35 -

find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue.

The qualification referred to by Lord Bingham was a condition protecting the litigant from the claims under United States so-called "racketeering" legislation: see at 437.

Lord Mackay of Clashfern, Lord Nicholls of Birkenhead and Lord Hobhouse of Woodborough agreed with Lord Bingham. Lord Scott of Foscote expressed similar views. Lord Scott referred at 443 to the "evident absurdity" of requiring separate hearings in different countries.

Similar sentiments concerning the potential costs and inconvenience in international maritime jurisdiction caused by fragmentation of litigation were expressed by Lord Goff of Chieveley on behalf of the Privy Council in *The 'Pioneer Container'* [1994] 2 AC 324 at 334-35.

108     The same considerations apply when the possibility or probability of inconsistent findings arises out of the conduct of an arbitral proceeding. There is no reason of principle why findings that may be made by an arbitrator that risk being inconsistent with findings made in a curial proceeding would not pose the same risks of what Brandon LJ in *The 'El Amria'* [1982] 1 Lloyd's Rep 119, 128 called the "potential disaster" of inconsistent curial findings. The risks inherent in "split" litigation and the reasons of public policy which underlie what Allsop J referred to as "the deep and strong antipathy of courts for the promotion of circumstances allowing for inconsistent curial approaches to the same dispute", apply equally when the potential for the inconsistent approaches arises out of the conduct of an arbitral proceeding. As Merkel J said in *Recyclers of Australia Pty Ltd v Hettinga Equipment Inc* (2000) 100 FCR 420, 435 at [66]: "The broad discretion arises as part of the exercise of a court's general power to control its own proceedings. The basis for the discretion is that the spectre of two separate proceedings — one curial, one arbitral — proceeding in different places with the risk of inconsistent findings on largely overlapping facts, is undesirable" (citations omitted). This statement of principle was said by the Full Court in *Hancock Prospecting Pty Ltd v Rinehart* (2017) 350 ALR 658; [2017] FCAFC 170, 738 at [334] to be "basal and correct". See also *BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169, 185 at [55] per Finkelstein J.

109     In my view, for the reasons explained above, Kraft ought to have included the claims made in this proceeding under the Australian Consumer Law in its notice of arbitration because those claims, contrary to Kraft's submission, do fall within the ambit of the arbitration clause in the master agreement. Instead, Kraft chose to initiate this proceeding, and then to prosecute it, including by filing a statement of claim and a reply to Bega's defence, participating in procedural directions, seeking discovery, filing a notice to produce, consenting to the filing

by Bega of a counterclaim (in which the issue of ownership of the trade dress issue is squarely raised) and then filing a defence to that counterclaim. As Bega submitted, Kraft is the party responsible for the bringing of both proceedings. It alone is the author of the possibility or probability of duplicated litigation and inconsistent findings. Each of those considerations also weighs significantly in favour of restraining the arbitration, at least until this proceeding is determined.

**The equitable basis for injunctive relief**

110     Having found that an injunction should go in the exercise of the court's implied power on the ground that restraining the taking of any further steps in the arbitration is necessary for the administration of justice to protect this court's proceedings or processes, it is, strictly speaking, unnecessary to decide the issues that divided the parties going to the alternative equitable basis for injunctive relief.

111     In deference to the detailed and very helpful submissions made by counsel for both sides, and because it may be important should leave to appeal be sought from any orders that may be made, I will give my reasons about each of the main issues that were the subject of submission by the parties on the question whether an anti-arbitration injunction should be granted in the exercise of the court's equitable jurisdiction, namely:

(1)     Bega's waiver point;

(2)     Kraft's Lanham Act point;

(3)     Kraft's contentions about what it says were Bega's inconsistent submissions to the United States District Court; and

(4)     Bega's contention that it is vexatious or oppressive to permit the arbitral proceeding to continue together with this proceeding.

*Waiver*

112     It was common ground that the question of whether, by issuing this proceeding, Kraft has waived, or elected not to pursue, its right to arbitrate what Kraft calls the "Trade Dress Dispute" is a question that goes to the court's discretion whether to issue an the anti-arbitration injunction. (Relatedly, Bega also submitted that Kraft had a contractual right to insist on arbitration, and even if its conduct did not amount to waiver or an election, it has lost that right because it has acted in a way that equity would regard as unconscionable in the circumstances).

113     A similar issue of waiver in the context of a stay application was considered by Finkelstein J
        in *BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169.  BHPB
        had entered into an agreement with a charterer of a cargo vessel.  The agreement contained a
        clause that any dispute arising out of the charter would be referred to arbitration and that
        English law would apply.   BHPB commenced a proceeding in this court against the
        respondent shipbrokers (Cosco) seeking damages regarding unremitted hire charges.  Cosco
        was not a party to the agreement with the charterer.

114     Cosco then took the following steps in the proceeding.  It filed an unconditional appearance
        and consented to draft orders about discovery and Cosco's cross-claim; served a notice to
        produce documents; served a request for particulars of BHPB's statement of claim; filed its
        defence (which included positive assertions indicating an intention to establish facts different
        from those that appeared in the statement of claim); exchanged lists of documents; filed
        particulars of its defence; requested BHPB's consent to deferring the appointment of a
        mediator until BHPB had joined the second respondent; requested that BHPB provide further
        discovery; gave particulars of its defence; and foreshadowed applying to interrogate and
        obtain further discovery from BHPB: see *BHPB Freight Pty Ltd v Cosco Oceania Chartering
        Pty Ltd* (2008) 168 FCR 169, 173 at [4].

115     "Notwithstanding having taken those steps, at a directions hearing held on 23 April 2007
        Cosco hinted that it might commence an arbitration in London.  Early the next morning,
        Cosco's London solicitors advised BHPB that Cosco had appointed Mr Oakley as its
        arbitrator 'in respect of all disputes arising out of the charter, in particular the claims
        currently being pursued against [it] by BHPB before the Federal Court of Australia'": *BHPB
        Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169, 173 at [5].  Cosco
        also applied to Finkelstein J to have BHPB's action stayed in favour of the arbitration
        pursuant to s 7 of the *International Arbitration Act 1974* (Cth).

116     BHPB then moved for an ex parte injunction "to restrain Cosco from taking any step in any
        court to restrain this proceeding or to restrain BHPB from taking any step in this proceeding
        (the anti-anti-suit injunction)".  BHPB also sought to "restrain Cosco from taking any further
        steps in the arbitration (the anti-arbitration injunction)": *BHPB Freight Pty Ltd v Cosco
        Oceania Chartering Pty Ltd* (2008) 168 FCR 169, 173 at [6].

117     Finkelstein J held, for reasons not relevant here, that Cosco could not enforce a stay under s 7
        because it was not claiming "through or under" a party to an arbitration agreement within the

- 38 -

meaning of s 7(4) of the *International Arbitration Act 1974* (Cth). He also held that the court has no inherent power to grant a stay in favour of arbitration. His Honour then dealt, by way of obiter dicta, with the waiver argument as follows (*BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* 168 FCR 169, 184-185 at [52]-[54]):

> I would hold that Cosco has waived its right to ask for a stay. In *ACD Tridon Inc v Tridon Australia Pty Ltd* [2002] NSWSC 896, Austin J discussed waiver in the context of a stay application. He said that two forms of waiver arise where there is an attempt to enforce an arbitration clause. The first, which he referred to (at [62]) as "waiver in the stronger sense", occurs when a party makes an intentional and irrevocable choice not to exercise a right when it has notice of the right, with the result that the right is abandoned. The second, which he referred to (at [69]) as "waiver in the weaker sense", occurs when a party fails to insist upon a right at an appropriate time either by choice or default. He said (at [60]) that the latter form of waiver applies to the exercise of the court's discretion whether or not to grant a stay. In this connection he said (at [88]) that the knowledge of the party of the existence of the right to a stay will be a relevant but not decisive consideration. See also *Zhang v Shanghai Wool & Jute Textile Co Ltd* (2006) 201 FLR 178, 185; *La Donna v Wolford AG* (2005) 194 FLR 26, 30.
>
> The present case is a strong case of waiver in the weaker sense. The facts show an intentional and unequivocal choice by Cosco not to insist on its purported right to arbitrate and instead accept the curial process: cf *Australian Granites Ltd v Eisenwerk Hensel Bayreuth Dipl-Ing Burkhardt GmbH* [2001] 1 Qd R 461; *Zhang* 201 FLR 178. First, Cosco entered an unconditional appearance. Second, it did not raise the possibility of an arbitration until 23 April 2007, some eight and a half months after the action was commenced. This occurred in circumstances where, according to Mr Liu, an employee of Cosco, the shipbroker had given active consideration to the possibility of referring the dispute to arbitration in London from, or very soon after, the commencement of the action. Early on Cosco even took advice from its Australian lawyers on the possibility of arbitration. In late February 2007 it also sought advice from its London solicitor. Still it took weeks to make its move.
>
> The third point is that the various steps taken by Cosco in the proceeding indicate a willingness on its part to allow the claim to be resolved by the court. I refer in particular to filing a positive defence, giving and taking discovery and seeking and obtaining an order to cross-claim. These steps imposed a burden on BHPB consistent only with the premise that Cosco would defend the claim in court: *La Donna* 194 FLR at 31.

118    Senior Counsel for Bega placed particular reliance on Kraft's notice of dispute dated 27 September 2017, set out at [40] above. He submitted that the letter shows that Kraft must have known that its Australian Consumer Law case about the advertisements (which were broadcast after the letter was written) was subject to the dispute resolution clause in the master agreement, because the letter contained a warning that if Bega persisted with its use of the Kraft trade dress, Kraft would invoke the dispute resolution mechanism in section 7.1 of the master agreement. Counsel referred in particular to paragraph [12] of the letter, which asserts that "Bega's continued use of the Peanut Butter Trade Dress after December 31, 2017,

- 39 -

would … be likely to mislead or deceive consumers into believing that Bega's peanut butter is actually KRAFT peanut butter, or that the peanut butter is otherwise associated with the owner of the KRAFT brand. This constitutes misleading and deceptive conduct and would be unlawful under the Australian Consumer Law". The letter goes on to say that "[t]he dispute resolution process provides for initial negotiations and mediation and, if the dispute remains unresolved, arbitration proceedings in New York … As the dispute remains unresolved, we wish to move forward with the dispute resolution procedures …" (at [15]-[16]).

119     Bega's first point is that rather than "moving forward with the dispute resolution procedures" under the master agreement with respect to its claim that Bega had engaged in "misleading and deceptive conduct [that was] … unlawful under the Australian Consumer Law", Kraft instead issued this proceeding, in which Kraft sought not only interlocutory urgent relief (an exception that the master agreement permits), but also final relief, permanent injunctions and damages. Bega's second point was put this way by senior counsel in oral argument:

> The second point is that there is this early conception, early articulation, that the use of the trade dress breached the Australian Consumer Law. Subsequently, soon after commencing proceedings alleging a breach of the Consumer Law, and they confine those proceedings to the advertisements, they don't also contain a more general allegation that the use of the trade dress is also misleading or deceptive. But obviously, the two are very closely related because the advertisements convey a message, they use the trade dress … and Kraft's lawyers … from America, [are] … obviously aware of the Australian Consumer Law provisions say, "Your conduct in using the trade dress is also a breach of that same statute".

> Now, this is relevant because there is a conscious decision to start the Australian proceedings in the way they did. They could readily have included this complaint in those Australian proceedings. For whatever reason, they chose not to, but they were aware of it. They were aware of the existence of the potential claim, but they chose not to agitate it. That's important because there are matters of informed choice … and the reference to the dispute resolution process in connection with representations to customers about matters including trade origin or association with Kraft, they saw as falling within the scope of the dispute resolution clause. Now, of course, they say, 'Well, consumer law claims weren't within the scope. We couldn't have arbitrated them'. But we say they plainly are within the scope of the clause.

120     Bega says that, because Kraft knew that it could or should have taken the advertising claim to arbitration, and, inconsistently with that right to arbitrate, elected instead to bring this proceeding, it lost that right. It also says that because this is an unusual case where a party has commenced a proceeding as plaintiff, it is a stronger case than, say, *BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169, or *La Donna Pty Ltd v*

- 40 -

*Wolford AG* (2005) 194 FLR 26, which was also cited in argument, where it was the actions of the defendant in curial proceedings that were said to constitute waiver.

121    Kraft submits that questions of waiver are to be decided by the arbitrators or by the United States District Court, not this court.  It also submits that it is necessary for this court to look at the conduct of the parties as a whole: *Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* (2006) 157 FCR 45 at [96].  In that regard, it submits that this case is distinguishable from cases like *La Donna Pty Ltd v Wolford AG* (2005) 194 FLR 26 and *BHPB Freight Pty Ltd v Cosco Oceania Chartering Pty Ltd* (2008) 168 FCR 169.  Counsel submitted that in those cases the courts refused to stay their own proceedings because the applicant for the stay had participated in the court proceeding to a sufficiently advanced point and had failed to mention arbitration of the same dispute until a late stage in the proceeding. Kraft contends that "nothing could be more consistent with evincing an intention to arbitrate than Kraft's conduct in taking and vigorously pursuing the proceeding [in the United States District Court] in order to compel arbitration of the Trade Dress Dispute.  By Kraft's conduct since 20 October 2017, Bega could be in no doubt that Kraft was pressing for the Trade Dress Dispute to be heard under the dispute resolution provisions of the [master agreement]".

122    Kraft says that it did not waive its right to arbitrate because:

(1)    Kraft instituted and prosecuted proceedings in the United States District Court on 20 October 2017 to compel arbitration of the Trade Dress Dispute;

(2)    during the United States District Court proceedings, Kraft consistently pressed for the Court to make orders that Bega be compelled to both mediate and arbitrate the Trade Dress Dispute;

(3)    on numerous occasions, Bega told Judge Ramos that it would mediate and arbitrate, expressly stating that it would comply with the dispute resolution process identified in Article VII of the master agreement;

(4)    both parties participated in the dispute resolution process identified in the master agreement and mediated the Trade Dress Dispute on 12 January 2018; and

(5)    Bega participated in the dispute resolution process subject to only one caveat, being the right to contest arbitrability, which Bega submitted should be determined by the arbitrators.

123    Kraft also says that, for there to be a waiver, what must occur is an unequivocal statement of abandonment of the arbitration: see *Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* (2006) 157 FCR 45, at [92]-[93]. It says that "[t]here has been no such unequivocal statement in respect of the Trade Dress Dispute, especially when considered in light of the conduct as a whole".

124    I agree with Kraft's submissions of the question of waiver. In light of the manner in which it pressed and continued to press for arbitration of what it calls the Trade Dress Dispute in the United States District Court, taking its conduct as a whole (and not only having regard to Kraft's conduct of this proceeding), for the reasons Kraft submitted, in my view it cannot be said to have waived, or elected not to proceed with, the right to arbitrate.

125    For the reasons I have given earlier, in my view, Kraft's submission in this court that the Australian Consumer Law claim the subject of this proceeding is not "in relation to" the master agreement is wrong. Kraft got it right in its 27 September 2017 notice of dispute, the essential premise of which can only be understood to be that claims of the type identified in that notice under the Australian Consumer Law either "arose out of" or were "in relation to" the master agreement. But the inconsistency between that position and the position adopted here is insufficient to found a waiver or election of the right to arbitrate when regard is had to Kraft's conduct as a whole.

126    For the same reasons, I do not accept Bega's contention that, even if Kraft's conduct did not amount to waiver or an election, it has lost that right because it has acted in a way that equity would regard as unconscionable in the circumstances.

### *The Lanham Act*

127    Kraft contends that because its arbitral claim involves a claim under the Lanham Act, and Australian courts have no jurisdiction to hear such a claim, it cannot be afforded "complete relief" in this proceeding. It says that is a ground which alone means that Bega's claim for injunctive relief on the vexatious or oppressive ground cannot succeed.

128    Kraft relies on the following passages from the judgment of the plurality in *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 393-394, for the proposition that it is not sufficient that the subject matter of the arbitration be part of the same "matter" for constitutional purposes as the subject matter of this proceeding because, as Kraft's counsel put it, "[w]hat's needed is complete correspondence. It's only if there's nothing which can be

- 42 -

gained by the other proceedings over and above what may be gained in the local proceeding that there could be relief":

> ... Thus, it was said in *Carron Iron Company v Maclaren* (1855) 5 HLC 416 at 437 [10 ER 961 at 970] that "[w]here [there is] ... pending a litigation here, in which complete relief may be had, [and] a party to the suit institutes proceedings abroad, the Court of Chancery in general considers that act as a vexatious harassing of the opposite party, and restrains the foreign proceedings."
>
> In *Société Aerospatiale [Industrielle Aerospatiale v Lee Kui Jak]* [1987] AC 871 at 893-894], the Privy Council emphasised that the various cases decided in the nineteenth century with respect to vexation and oppression, including *Peruvian Guano Company v Bockwoldt* (1883) 23 Ch D 225, have continuing significance for the grant of anti-suit injunctions. Those cases establish that the mere co-existence of proceedings in different countries does not constitute vexation or oppression. In particular, *Peruvian Guano* establishes that "double litigation [which] has no other element of oppression than this, that an action is going on simultaneously abroad, which will give other or additional remedies beyond those attainable in [the domestic forum]" does not amount to vexation or oppression.
>
> More recently, in ***Bank of Tokyo Ltd v Karoon*** **[1987] AC 45 at 60, Robert Goff LJ pointed out, correctly, in our view, although without specific reference to underlying equitable principle, that foreign proceedings are to be viewed as vexatious or oppressive only if there is nothing which can be gained by them over and above what may be gained in local proceedings. On the other hand, they are vexatious or oppressive if there is a complete correspondence between the proceedings or, in terms used in *Carron Iron Company*, if "complete relief" is available in the local proceedings.**
>
> (Footnotes omitted, emphasis added).

129    Bega submits that there can be a complete correspondence between this proceeding and the arbitration. It says that this court would have jurisdiction to hear the claim for relief brought under the Lanham Act in the arbitration pursuant to its pendent or accrued jurisdiction, because it arises out of the same sub-stratum of facts pleaded in this proceeding.

130    It is not sufficiently clear how it is that this court would, by operation of Australian choice-of-law rules, or otherwise, have jurisdiction to hear a claim brought under the Lanham Act (a United States Federal statute) in respect of a wrong alleged to have occurred in Australia, in circumstances where the governing law of the master agreement is "the internal Laws of the State of New York". (It will be recalled that the governing law provision in the master agreement provides that "all disputes or controversies arising out of or relating to this Agreement ... shall be governed by, and construed in accordance with, the internal laws of the State of New York..."). That question was not the subject of any submission of substance. I therefore proceed on the basis that Kraft's Lanham Act claim could not be brought in this court.

- 43 -

131    Bega also says that the substantive relief that may be obtained under the Lanham Act may be obtained under the Australian Consumer Law, or through a passing off claim, or both. According to Bega, this duplication is "unjustified" where a party has "started in a place where complete relief is available" and proceeds to "start seeking in another place ... some other relief which is available in the first place." That, it submits, is a "classic category of vexatious conduct".

132    It has been said in other contexts that there is some affinity between s 43(a) of the Lanham Act (one of the two provisions relied upon by Kraft) and s 53(eb) of the *Trade Practices Act 1974* (Cth) (now s 29(1)(k) of the Australian Consumer Law). In *Netcomm (Australia) Pty Ltd v Dataplex Pty Ltd* (1988) 81 ALR 101, 106, for example, Gummow J said:

> [...Section] 53 (eb) of the [Trade Practices] Act proscribes the making by a corporation, in trade or commerce, in connexion with the supply or possible supply of goods or services or in connexion with the promotion by any means of the supply or use of goods or services, of a false or misleading representation concerning the place of origin of goods.
>
> Para. (eb) has some affinity with s.43 (a) of the Lanham Act 1946 ... This prohibits, inter alia, persons using in connexion with any goods or services "a false designation of origin". The latter expression has been judicially interpreted as including designation not only of place of manufacture, but also of the identity of the manufacturer, supplier or franchisor of goods or services. This expansive interpretation has attracted criticism (e.g. by Professor Germain in the ebulliently titled article "Unfair Trade Practices Under Section 43(a) of the Lanham Act: You've Come a Long Way, Baby - Too Far, Maybe", (1974) 64 *Trade Mark Reporter* 193 at 206, 218-221). The terms of the Australian para. (eb) perhaps reflect the United States experience by making it plain that "origin" has a purely geographic denotation.

133    In *Hogan v Pacific Dunlop Ltd* (1988) 83 ALR 403, 418-19 Gummow J made these observations about the degree of similarity between s 43(a) of the Lanham Act and s 52 of the Trade Practices Act (now s 18 of the Australian Consumer Law):

> I have referred elsewhere [in *Netcomm*] to the affinity between [s 43(a) of the Lanham Act] and para. 53(eb) of the [Trade Practices] Act. As the Lanham Act has been interpreted, it will be apparent that it is a fairly broadly based provision with some resemblances to s. 52 itself. The United States authorities indicate that s. 43(a) creates a distinct federal statutory tort designed to afford broad protection against various forms of unfair competition and false advertising, including deceptive and misleading advertising. The section is directed not only at acts which would qualify as trade mark infringement, but also at unfair competitive practices involving potential deception; standing to sue extends to "competitors" injured by the false advertising, but not to consumers at large. The authorities supporting these propositions are collected in *Colligan v Activities Club of New York Ltd* 442 F. 2d 686 (1971) at 692; *Alfred Dunhill Ltd. v Interstate Cigar Co Inc* [1974] USCA2 507; 499 F 2d 232 (1974) at 236; *Estate of Elvis Presley v Russen* 513 F. Supp 1339 (1981) at 1376.

- 44 -

An interlocutory injunction will issue in respect of apprehended contravention of s. 43(a) where an advertisement creates a reasonable likelihood of confusion by consumers regarding the origin or sponsorship of a product or services. In *Dallas Cowboys Cheerleaders Inc. v Pussycat Cinema Ltd* (1979) 604 F 2d 200, such an injunction issued and the Court of Appeals (Second Circuit) held that the district court had not erred in finding that the plaintiff had established the likelihood of confusion within the meaning of the statute; the Court of Appeals noted that the "plaintiff expect(ed) to establish on trial that the public may associate it with the defendants' movie and be confused into believing that plaintiff sponsored the movie, provided some of the actors, licensed defendants to use the uniform [of the Cheerleaders], or was in some other way connected with the production".

134   Gummow J also went on to say (*Hogan v Pacific Dunlop Ltd* (1988) 83 ALR 403, 422):

… the decisions applying s. 43(a) of the Lanham Act are not concerned with "unfair competition" in some global sense, but with a particular form thereof namely that arising through misrepresentation. In that respect, they respond to the same concerns as do ss. 52 and 53 of the [Trade Practices] Act, and the tort of passing off. Whilst it is erroneous to approach s. 52 on the assumption that its application is confined exclusively to circumstances which constitute some form of representation, misleading or deceptive conduct generally consists of representations, whether express or by silence; this is so particularly where the allegedly misleading or deceptive conduct arises in the type of factual setting with which passing off actions often have been concerned …

(Citations omitted)

135   Although the observations of Gummow J are useful in describing, by way of background, some of the circumstances in which s 43(a) of the Lanham Act may provide a remedy similar to that available under the Australian Consumer Law in certain circumstances, they do not found any sufficient support for Bega's assertion in this case (and it was, with respect, no more than an assertion) that the Australian Consumer Law could provide equivalent relief. Accordingly, I do not accept the assertion.

136   Bega's principal submission is that Kraft's Lanham Act claim is untenable. It says that its un-contradicted expert evidence establishes that the Lanham Act claim is untenable because:

(1)   the relevant conduct alleged about misuse of the "Peanut Butter Trade Dress" occurred only in Australia;

(2)   that conduct has no, or no substantial, connection with United States commerce;

(3)   Bega is not a United States company;

(4)   Bega has no presence in the United States; and

(5)   accordingly, as a matter of law, the provisions of the Lanham Act relied upon cannot operate extra-territorially.

- 45 -

137     In aid of that submission, Bega relied on the unchallenged expert opinion evidence of Professor Barton Beebe.  Professor Beebe is the John M Desmarais Professor of Intellectual Property Law at the New York University School of Law, and specialises in trademark and copyright law.

138     Professor Beebe was asked to make, and did make, ten factual assumptions, as follows:

(1)     Bega's alleged conduct occurred wholly within Australia and New Zealand.

(2)     Bega is an Australian company.

(3)     Bega has no office, employees, or other presence in the United States.

(4)     Bega has no related companies or affiliates in the United States.

(5)     Bega makes no sales of peanut butter into the United States.

(6)     Bega has no plan or intention of making sales of peanut butter into the United States.

(7)     Bega does not advertise or market in the United States.

(8)     Kraft Foods [being the first applicant in this proceeding, referred to in these reasons as "Kraft"] currently does not export peanut butter into Australia or New Zealand.

(9)     Kraft Foods alleges that it owns all rights in the unregistered trade dress used by Bega for the peanut butter products that Bega sells in Australia and that Bega's use of that trade dress in Australia is an infringement pursuant to section 43 of the Lanham Act.

(10)    The relevant trade dress has been used only in the Australian market, and has not been used by Kraft Foods, Bega, or anyone else in respect of sales of peanut butter in the United States.

139     Mr Batt made two main criticisms of Professor Beebe's evidence, which he said meant that the Professor's evidence should be entirely discounted.  First, he submitted that Professor Beebe was not given a copy of the master agreement and, in particular, the choice of law provision.  He submitted that "documents reviewed [by Professor Beebe] do not include the [master agreement], and therefore, don't include the dispute resolution clause, which is where one finds the parties' bargain that American law is to be applied to determine any dispute between the parties … It's not equipped with that feature, and we submit … that that of itself is … the end of it, because you don't even get to the enquiry that the Professor has traversed, because the parties have already said 'apply the Lanham Act'.  That's it … And all the cases that are annexed [to Professor Beebe's evidence], that deal with whether, in different curial

- 46 -

circumstances, where there is no such agreement, the Lanham Act is to have extraterritorial application are just not to the point".

140    There was, as I have already noted, no evidence before the court about the meaning of the expression "the internal laws of the State of New York". There is no evidence, therefore, about whether that expression, as a matter of New York law, includes Federal laws. In the absence of any evidence that the internal laws of the State of New York include the provisions in the Lanham Act upon which Kraft relies, I am unable to accept that the fact that Professor Beebe's attention apparently was not drawn to the governing law provision in the master agreement has any significance, let alone that renders his evidence irrelevant, as Kraft submits. Kraft had an opportunity to adduce expert opinion evidence about the meaning and effect of the governing law clause, or for that matter any other expert evidence on the question about which Professor Beebe was asked to opine. But it did not adduce any expert evidence.

141    In those circumstances, it is not for this court to speculate about whether "the internal laws of the State of New York" includes United States Federal laws – speculation which Kraft's submission necessarily entails.

142    Kraft also submitted that factual assumption number 10 – "the relevant trade dress has been used only in the Australian market, and has not been used by Kraft Foods, Bega, or anyone else in respect of sales of peanut butter in the United States" – is an unreliable assumption because there is no evidence to show that Kraft had not used the trade dress outside Australia. In particular, Kraft submitted that a provision of the master agreement about sales made into other countries from Australia as a result of online activity (clause 2.8), so called "spillover" sales, contemplated the possibility that sales of peanut butter using the Kraft Trade Dress might conceivably have occurred outside the Australian market. In my view, that submission is, with respect, speculative and I reject it. (Otherwise, Kraft did not challenge any of the factual assumptions made by Professor Beebe).

143    I return to deal with the substance of Professor Beebe's evidence.

144    Professor Beebe was asked this question: "[w]ould a United States court find that United States trademark law could be applied extraterritorially in relation to Bega's alleged conduct in respect of Kraft Foods' infringement allegation?"

- 47 -

145    Professor Beebe proffered this summary of his answer by way of expert opinion: "based on the assumptions listed above, there is no likelihood that a United States court would apply United States trademark law extraterritorially to Bega's alleged conduct in this matter".

146    Professor Beebe explained his opinion as follows:

> In *Vanity Fair Mills, Inc v T Eaton Co*, 234 F.2d 633 (2d Cir. 1956), the United States Court of Appeals for the Second Circuit established three factors that courts should balance to determine if extraterritorial application of federal trademark law is appropriate. These factors are: (1) whether the defendant's conduct has a "substantial effect on United States commerce"; (2) whether the defendant is a United States citizen; and (3) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law ...
>
> The "substantial effect on United States commerce" factor is by far the most important factor that courts consider, and the lack of a "substantial effect on United States commerce" is arguably dispositive. See *Atl. Richfield Co v Arco Globus Int'l Co*, 150 F.3d 189, 192 (2d Cir. 1998) ("[W]e have never applied the Lanham Act to extraterritorial conduct absent a substantial effect on United States commerce.") ...
>
> ...
>
> Because of the importance of the "substantial effect on United States commerce" factor, **a United States court would decline to apply United States trademark law extraterritorially in this matter** given that Bega's alleged conduct occurred wholly within Australia and New Zealand, Bega has no presence of any kind in the United States, Bega does not sell or advertise its products in the United States, Bega has no intention to enter the United States market, the relevant trade dress has been used only in the Australian market, and [Kraft Foods] does not itself export peanut butter to Australia or New Zealand. All of these considerations taken together indicate that **Bega's alleged conduct does not have any significant, let alone "substantial"** effect on United States commerce.
>
> ...
>
> Also greatly relevant to the analysis of the extraterritorial application of United States trademark law is that Bega is not a United States company and has no presence in the United States. **It is generally held that when the defendant fails to satisfy two of the three *Vanity Fair Mills* factors, this is "fatal" to the extraterritorial application of United States trademark law.** *Vanity Fair Mills* 234 F.2d at 643.
>
> (Emphasis added)

147    Counsel for Kraft submitted that Professor Beebe's opinion that "there is no likelihood" that a United States court would apply United States trademark law extraterritorially in this case was in some sense equivocal.  I do not accept that submission.  It is clear from those parts of Professor Beebe's opinion which are emphasised in bold type in the immediately preceding paragraph of these reasons that he was expressing the (unchallenged) opinion that because Kraft's Lanham Act claim concerned conduct that occurred other than in the United States, it could only succeed if Kraft established that Bega's conduct had a "substantial effect on

United States commerce"; that Bega's alleged conduct did not have any significant, let alone "substantial" effect on United States commerce; and that, combined with the fact that Bega is not a United States company and has no presence in the United States, those considerations would be "fatal" to the extraterritorial application of the Lanham Act. Professor Beebe's expert opinion is, therefore, that Kraft's Lanham Act claim has no apparent aspect of validity.

148   In circumstances where that opinion went unchallenged, in my view, the proposition that there must be a "complete correspondence" between the relief available in the two relevant jurisdictions is of no assistance to Kraft in this case.

### Bega's submissions to the United States District Court

149   Kraft relies on a number of things that Bega told Judge Ramos at the conference hearings conducted before him, or in correspondence, which it says are inconsistent with the position now adopted by Bega in this court, as matters which should weigh against the exercise of the court's discretion to grant the injunctive relief sought by Bega on the equitable ground.

150   The history of the proceedings before the United States District Court, and of the relevant correspondence, is set out at paragraphs [42]-[51] of these reasons. Specifically, Kraft points to the following things that Bega, by its US attorneys, told the Court that:

    (1)    the issues raised in this proceeding were separate from the issues the subject of the notice of arbitration (see [49] of these reasons);

    (2)    Bega intended to comply with the dispute resolution provisions of the master agreement, including mediation and arbitration (see [47] of these reasons);

    (3)    this proceeding did not seek judicial determination of the trade dress dispute within the meaning of that phrase in the notice of arbitration (see [49] of these reasons); and

    (4)    it was for the arbitrators, not the United States District Court, to determine any issue of whether the dispute was arbitrable (see [45] of these reasons).

151   Kraft submits that these assertions are "hardly compatible" with the case Bega makes in this court and that Bega "seeks to resile" from the opposite positions it argued in the United States District Court.

152   Bega submits that, at all times, it made clear to Judge Ramos that it reserved its right to contest the arbitrability of the dispute the subject of the notice of dispute (set out at [49] of these reasons). Bega also submits that none of the contentions that it made before Judge

Ramos precluded it from contending, once the ambit of both this proceeding and the arbitration (and the overlap of issues) was appreciated, that the prosecution of the proceedings in the United States District Court was vexatious or oppressive. Bega further submits that it came to that view expeditiously and brought its application for injunctive relief before any substantive step occurred in the arbitration.

153   I am not persuaded that Bega's statements to the United States District Court would affect the exercise of this court's discretion whether to grant an anti-arbitration injunction. To the extent that Bega's counsel told Judge Ramos that the proceedings did not overlap, she did so before the notice of arbitration was served, and before the full scope of the dispute in this court was apparent from the various pleadings filed. Nor do I think it relevant that Bega's counsel told the court that the arbitrators should determine any issue of arbitrability. And on the question of waiver, Bega is correct that it made clear to Judge Ramos that it reserved to itself the right to challenge the arbitrability of the dispute.

154   Much of the factual material set out at [42]-[51] of these reasons was also relied upon by Kraft for the proposition that, in circumstances where it continued to press to arbitrate the dispute the subject of the notice of arbitration, it could not be said to have waived, or elected not to proceed with, its right to arbitrate. For the reasons set out earlier (at [124]) I agree with that submission. In those circumstances, it is unnecessary further to trawl through the various exchanges that occurred between counsel and Judge Ramos.

*Vexatious or oppressive*

155   Bega submitted, in relation to the equitable ground, that an injunction should be granted because it would be vexatious or oppressive for Bega to have to deal with an identical case on the question of ownership of the trade dress in two places at once.

156   Bega accepted that the mere co-existence of proceedings in different countries and the fact that additional expense will be incurred as a result will not amount to vexation or oppression: *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 393; *TS Production LLC v Drew Pictures Pty Ltd* (2008) 172 FCR 433, 448 at [55], [57] (per Gordon J, with whom Stone J agreed).

157   It was also common ground, as explained earlier, that "foreign proceedings are to be viewed as vexatious or oppressive only if there is nothing which can be gained by them over and

above what may be gained in local proceedings": *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 393.

158    In cases "**where different issues are involved in the local and foreign proceedings**, albeit that the different proceedings arise out of the same sub-stratum of facts … the question must be whether, having regard to the controversy as a whole" the arbitration would be "vexatious or oppressive" in the sense that it would be "productive of serious and unjustified trouble and harassment" or "seriously and unfairly burdensome, prejudicial or damaging" to Bega: *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 400-401; *TS Production LLC v Drew Pictures Pty Ltd* [2008] FCAFC 194 (2008) 172 FCR 433, 448 at [56] (emphasis added).

159    I have explained earlier why, in my view, the Lanham Act does not assist Kraft in this case.  I have also explained why, in my view, the question of the ownership of the packaging or get-up/trade dress is a question central to the claims made by Kraft both in the arbitration and in this proceeding.  They are not, as Kraft submitted, "entirely different claims".

160    Kraft contended that, even if that is so, there are significant differences in the relief sought in the two proceedings, and that this is sufficient for the court to decline to exercise its discretion in favour of granting an anti-arbitration injunction on the equitable ground.

161    Mr Batt submitted in oral argument: "[I]n this proceeding, the relief sought is declarations that the [advertisements] are misleading, injunctions restraining publication of the [advertisements], corrective advertising and damages for misleading conduct.  Not damages for use of the trade dress or breach of contract and no injunction is sought to restrain use of the trade dress [claimed in the arbitration]".

162    Assuming, without deciding, that because different relief is sought in the two proceedings it can, in this context, be said that different "issues" are involved, the question that then falls to be determined when relief is sought on the equitable ground is whether, having regard to the controversy as a whole, the arbitration would be vexatious or oppressive in the sense that it would be productive of serious and unjustified trouble and harassment or seriously and unfairly burdensome, prejudicial or damaging to Bega: *CSR Ltd v Cigna Insurance Australia Ltd* (1997) 189 CLR 345, 400-401.

163    This question was not squarely addressed in oral argument or in written submissions. Nonetheless, there might be something to be said in Bega's favour on the question whether

- 51 -

forcing Bega to litigate the question of the ownership of the packaging and get-up/trade dress in two places at one would cause it serious and unjustified trouble and harassment, or be seriously and unfairly burdensome or prejudicial to it. But given (1) the scant attention given to the question at the hearing, and (2) that the question is unnecessary to decide, I will not say anything more about it.

**A final matter**

164    I should also deal briefly with a submission made by Mr Batt on behalf of Kraft about s 7 of the *International Arbitration Act 1974* (Cth). Sub-section 7(2) of that Act provides:

> (2) Subject to this Part, where:
>
>> (a) proceedings instituted by a party to an arbitration agreement to which this section applies against another party to the agreement are pending in a court; and
>>
>> (b) the proceedings involve the determination of a matter that, in pursuance of the agreement, is capable of settlement by arbitration;
>
> on the application of a party to the agreement, the court shall, by order, upon such conditions (if any) as it thinks fit, stay the proceedings or so much of the proceedings as involves the determination of that matter, as the case may be, and refer the parties to arbitration in respect of that matter.

165    Kraft submitted that, assuming Bega's waiver contention was not accepted (which it was not), and assuming that the dispute the subject of this proceeding is within the arbitration clause contained in the master agreement (which it is), then in circumstances where Bega knew that the arbitration in New York was "imminent," Bega ought to have brought an application in this court under s 7(2) to stay this proceeding – which application, Kraft said, would on those assumptions have succeeded.

166    I reject that submission. First, Bega had no obligation to seek a stay under s 7 of the *International Arbitration Act 1974* (Cth) or otherwise. Secondly, if the stay application was bound to have succeeded on those grounds, one would have thought it rather suggests that Kraft should not have brought the proceeding in this court in the first place.

167    Having decided that an injunction should go in the exercise of this court's implied power, in all the circumstances, it is unnecessary to say anything further about Bega's case that anti-arbitration should be granted on equitable grounds.

- 52 -

**Conclusion**

168   Kraft submitted that the "upshot" of Bega's position is that "it seeks to reverse the proper nature of things.  It seeks to pull into this court two proceedings, both of which, on its own case, are within the arbitration agreement".

169   There are two fundamental difficulties with that submission.  First, I did not understand Bega to be contending (leaving to one side a possible implication of its unsuccessful waiver argument) that Kraft must necessarily bring the arbitration dispute in this proceeding.  Secondly, whatever apparent incongruity there may be thought now to exist is something that Kraft has brought about by its own actions in bringing and prosecuting its case, and by joining issue with Bega's defence and counterclaim, in this court.

170   As at present advised, and, of course, subject to hearing further from the parties, I am inclined to grant an injunction the effect of which will be to restrain the first applicant from taking of any further steps in the arbitration pending the determination of this proceeding, and to make directions for the filing of evidence, and fixing the proceeding for trial, with the expectation that it will commence in the next month or two.

171   Counsel for Kraft asked, and there was no objection from Bega, that if I were minded to grant an injunction (as I am), that I should provide the parties with an opportunity to make submissions about the form of any order that may be made, in light of my reasons.  So I will say no more about the form of relief, or trial directions, and direct that the matter to be relisted for further argument.

I certify that the preceding one hundred and seventy-one (171) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice O'Callaghan.

Associate
Dated:        20 April 2018

- 53 -

## SCHEDULE A

**KRAFT'S AMENDED STATEMENT OF CLAIM:**

1.     The First Applicant is and was at all material times a corporation duly incorporated in Delaware, with its principal place of business in Pittsburgh, Pennsylvania, and is entitled to sue in its corporate name.

2.     The Second Applicant is and was at all material times a corporation duly incorporated in Australia and is entitled to sue in its corporate name.

3.     Since at least 1931, the First Applicant and/or its predecessors in title and their respective licensees have widely and extensively used and promoted peanut butter under and by reference to the word "Kraft" and/or the Kraft logo ("**the Kraft Brand**") in Australia including on peanut butter as shown below:



4.     As a result of the matters in the previous paragraph:

(a) the public in Australia has come to exclusively and distinctively associate the Kraft Brand with the First Applicant and persons authorised by it;

(b) the Kraft Brand has become well known to the public throughout Australia as denoting the business of the First Applicant and the goods sold by it or persons authorised by it, and has acquired substantial goodwill and a valuable reputation throughout Australia; and

(c) persons who intend to acquire peanut butter or other goods sold under and in respect of the Kraft Brand intend and/or expect to acquire such products from the First Applicant or persons authorised by it.

5.     By reason of the extensive and widespread promotion of the Kraft Brand in Australia, the First Applicant has acquired an exclusive and valuable goodwill and reputation in respect of that brand.

6.     Furthermore, the First Applicant is the registered owner under the *Trade Marks Act 1995* (Cth) of trade marks for both the word "Kraft" and the Kraft logo for a wide range of food products including peanut butter.

**Conduct of the Respondent**

7.     The Respondent is and was at all material times a corporation duly incorporated in Australia and is entitled to be sued in its corporate name.

8.     The First Applicant has since 4 July 2017 exclusively licensed the Respondent to use the Kraft Brand in Australia in respect of various goods including peanut butter spread ("**the Licence**").

- 54 -

## PARTICULARS

Master Licence and Ownership Agreement executed 27 September 2012, as amended by Settlement Agreement dated 22 June 2015 and assigned to the Respondent on or around 4 July 2017.

9.    The Licence will cease on 31 December 2017 and as a consequence the Respondent will have no right to use the Kraft Brand after that date, at which time the Applicants will use the Kraft Brand in Australia.

10.   Sometime prior to the issuance of proceedings, at a precise time unknown to the Applicants, the Respondent published or caused to be published advertisements advertising to consumers in Australia of peanut butter as follows:

(a)  a radio advertisement broadcast on multiple radio stations nationally as part of regular "traffic report" segments including Smooth FM ("**the Bega Radio Advertisement**");

(b)  a "BrandPower" television advertisement broadcast on the major television networks (being Channels 7, 9 and 10) in metropolitan markets as well as the digital channels GEM, GO, ONE, Eleven, 7Mate, 7Flix, 7Two ("**the First Bega Television Advertisement**"));

(c)  a television advertisement depicting a worker named "Charlie" taste–testing peanut butter, broadcast on the major television networks in metropolitan markets ("**the Second Bega Television Advertisement**");

(d)  a television advertisement depicting a worker named "Charlie" eating his lunch, broadcast on the major television networks in metropolitan markets ("**the Third Bega Television Advertisement**"); and

(e)  a television advertisement depicting a worker named "Charlie" standing in a production facility, broadcast on the major television networks in metropolitan markets ("**the Fourth Bega Television Advertisement**"),

(collectively "**the Bega Advertisements**").

## PARTICULARS

Copies of the Bega Advertisements are stored on a USB memory stick and are available for inspection at the offices of the Applicants' solicitors upon reasonable notice.

11.   Each of the Bega Advertisements conveys to the ordinary reasonable consumer of peanut butter representations to the effect that:

(a)  Kraft peanut butter is now Bega peanut butter or is being replaced by Bega peanut butter (the "**First Representation**");

(b)  peanut butter labelled with the Kraft Brand is no longer available for purchase or will cease to be available for purchase (the "**Second Representation**");

(c)  the Kraft Brand has ceased to exist or is ceasing to exist in relation to peanut butter (the "**Third Representation**");

(d)  the Kraft Brand has changed to, or is changing to, Bega in relation to peanut butter (the "**Fourth Representation**");

- 55 -

(e) the only difference between Kraft peanut butter and Bega peanut butter is the name (the "**Fifth Representation**"); and

(f) the Respondent is, or was until very recently, selling peanut butter under the Kraft Brand (the "**Sixth Representation**").

12.  Further, the First Bega Television Advertisement represents that peanut butter sold under the Kraft Brand is not, or was not, Australian made (the "**Seventh Representation**").

13.  Each of the First, Second, Third, Fourth, Fifth, Sixth and Seventh Representations (the "**Impugned Representations**") are made in trade and commerce.

14.  The First Representation is false, misleading and deceptive or likely to be so in that Kraft peanut butter has not changed its name to Bega peanut butter and is not being replaced by Bega peanut butter, but rather Kraft peanut butter will retain its name and continue to be sold in Australia under that name.

15.  The Second Representation is false, misleading and deceptive or likely to be so in that Kraft peanut butter will continue to be available for purchase, notwithstanding that the Respondent's licence to use the Kraft Brand is ending.

16.  The Third Representation is false, misleading and deceptive or likely to be so in that the Kraft Brand has not ceased to exist and is not ceasing to exist, but will continue to be used in the marketplace in relation to peanut butter and other products.

17.  The Fourth Representation is false, misleading and deceptive or likely to be so in that the Kraft Brand has not changed and is not changing to Bega in relation to peanut butter or otherwise.

18.  The Fifth Representation is false, misleading and deceptive or likely to be so in that the end of the Respondent's licence to use the Kraft Brand is not a mere name change, but rather is a fundamental change to the trade origin and potentially the quality of peanut butter sold by the Respondent.

19.  The Sixth Representation is false, misleading and deceptive or likely to be so in that the Respondent does not, and to the best of the Applicants' knowledge has never, sold peanut butter labelled with the Kraft Brand including labelling as shown in the Bega Television Advertisement. The Respondent is transitioning from the brand "The Good Nut" to Bega, and not from the Kraft Brand to Bega.

20.  The Seventh Representation is false, misleading and deceptive or likely to be so in that peanut butter sold under the Kraft Brand in Australia is and previously was Australian made.

**Request to cease publishing the Bega Advertisements**

21.  The Applicants have requested the Respondent to cease its aforesaid conduct but the Respondent has failed to do so and threatens, intends and will, unless restrained by this Honourable Court, continue to do the aforesaid wrongful acts.

**PARTICULARS**

- 56 -

Letter from Spruson & Ferguson Lawyers to Addisons, lawyers for the Respondent, dated 1 November 2017 and letter from Addisons to Spruson & Ferguson Lawyers dated 6 November 2017.

**Contravention of the Australian Consumer Law**

22. By reason of the aforesaid conduct and each of the Impugned Representations taken individually, the Respondent has engaged in conduct that is misleading or deceptive or likely to mislead or deceive, in contravention of s 18 of the *Australian Consumer Law*.

**Loss and Damage**

23. The Applicants have, and will continue to, sustain loss and damage by reason of the aforesaid acts, including damage to the Kraft Brand and that damage will continue unless that conduct is restrained.

PARTICULARS

The Applicants are unable to provide at this time quantification of loss and damage and reserves their rights to claim at trial any and all relief to which they are entitled.

## KRAFT'S ORIGINATING APPLICATION:

1. A declaration that the Respondent has by the publishing of the Bega Advertisements (as defined in paragraph 10 of the Statement of Claim) contravened section 18 of the *Australian Consumer Law* found in schedule 2 of the *Competition and Consumer Act 2010* (the *Australian Consumer Law*).

2. A permanent injunction pursuant to section 232 of the *Australian Consumer Law* restraining the Respondent whether by itself, by its directors, servants or agents, or howsoever otherwise from:

   (a) publishing or broadcasting the Bega Advertisements;

   (b) making in trade and commerce any of the Impugned Representations (as defined in paragraph 13 of the Statement of Claim).

3. An order for corrective advertising, in such terms and by such means as the Court deems fit, pursuant to section 238 of the *Australian Consumer Law*.

4. Damages.

5. Costs.

...

## BEGA'S DEFENCE:

To the applicants' amended statement of claim dated 22 November 2017 the respondent (**Bega**) says as follows:

1. As to paragraph 1 it says as follows:

   (a) it admits that the first applicant (**Kraft Foods**) was incorporated on or about 1 June 2012; and

   (b) it otherwise denies paragraph 1.

2. It admits paragraph 2.

3. As to paragraph 3 it says as follows:

(a) it does not know, and so cannot admit, to what extent Kraft Foods and/or its predecessors in title and their respective licensees have promoted peanut butter in Australia under and by reference to the word Kraft and/or the Kraft logo (shown below) (the **Kraft Trade Mark**), and accordingly it denies the allegation;



(b) it specifically denies that since 2012 Kraft Foods, or any 'authorised user' within the meaning of s 8 *Trade Marks Act 1995* (Cth), has used or promoted peanut butter in Australia under and by reference to the Kraft Trade Mark; and

(c) it refers to and repeats the allegations at paragraphs 24 to 40 below.

4. As to paragraph 4 it says as follows:

(a) it admits that a consumer purchasing peanut butter in Australia that bore the Kraft Trade Mark would expect that those goods had been manufactured by the owner of the Kraft Trade Mark, or someone authorised by the owner of the Kraft Trade Mark;

(b) it admits that there has been goodwill developed among consumers in Australia in the Kraft Trade Mark in respect of peanut butter;

(c) it denies that Kraft Foods owns that goodwill insofar as that goodwill relates to the sale of peanut butter in Australia since October 2012;

(d) it refers to and repeats the denials and allegations in paragraph 3 above, and paragraphs 24 to 40 below; and

(e) it otherwise denies paragraph 4.

5. As to paragraph 5 it says as follows:

(a) it refers to and repeats its admissions and denials in paragraphs 3 and 4 above, and in paragraphs 24 to 40 below;

(b) it says that the goodwill from the promotion and sale of relevant peanut butter products was associated with each of:

i. the Kraft Trade Mark;

ii. the NEVER OILY NEVER DRY trade mark; and

iii. the packaging and get-up, including the yellow lid, clear container, and predominantly yellow label;

(c) it denies that Kraft Foods owns the goodwill referred to in paragraph (b) above insofar as that goodwill is associated with:

i. the use of the Kraft Trade Mark in Australia since about October 2012;

ii. the NEVER OILY NEVER DRY trade mark; or

- 58 -

iii.   the packaging and get-up, including the yellow lid, clear container, and predominantly yellow label; and

(d) it otherwise denies paragraph 5.

6.   It admits paragraph 6.

**Conduct of the respondent**

7.   It admits paragraph 7.

8.   As to paragraph 8 it says as follows:

(a) it admits that pursuant to a sale and purchase agreement between it and Mondelez Global LLC, Mondelez Australia (Foods) Ltd and Mondelez Australia Pty Limited (together, **Mondelez**) dated 19 January 2017 it acquired certain assets from Mondelez and other Mondelez group companies;

(b) it will refer to that agreement at trial for its full terms and effect; and

(c) it otherwise denies paragraph 8.

9.   As to paragraph 9 it says as follows:

(a) it admits that insofar as any licence was transferred to Bega it expires on 31 December 2017;

(b) it admits that the applicants intend to use the Kraft Trade Mark in Australia from early 2018 in relation to peanut butter; and

(c) it otherwise denies paragraph 9.

10.   As to paragraph 10 it says as follows:

(a) it admits paragraph (a);

(b) it admits paragraph (b), save that the First Bega Television Advertisement was not broadcast on the digital channel 7Flix prior to the issuance of proceedings;

(c) it denies paragraph (c) and says further that the Second Bega Television Advertisement was not broadcast on the major television networks in metropolitan markets prior to the issuance of proceedings;

(d) it denies paragraph (d) and says further that the Third Bega Television Advertisement was not broadcast on the major television networks in metropolitan markets prior to the issuance of proceedings; and

(e) it denies paragraph (e) and says further that the Fourth Bega Television Advertisement was not broadcast on the major television networks in metropolitan markets prior to the issuance of proceedings.

11.   As to paragraph 11 it says as follows:

(a) it denies paragraph 11; and

(b) it says that it has correctly represented in the advertisements referenced in paragraph 10 of the amended statement of claim (**Advertisements**) that the peanut butter product that was formerly supplied in Australia by reference to the Kraft Trade Mark is now being supplied under the Bega

- 59 -

trade mark.

12. As to paragraph 12 it says as follows:

    (a) it denies paragraph 12; and

    (b) it says that it has correctly represented in the First Bega Television Advertisement referenced in paragraph 10(b) of the amended statement of claim that the peanut butter product that was formerly supplied in Australia by reference to the Kraft Trade Mark was not previously Australian owned and made, but now is.

13. As to paragraph 13 it says as follows:

    (a) It admits that any representations that it made by causing the Advertisements to be shown were made in trade and commerce; and;

    (b) it otherwise denies paragraph 13.

14. As to paragraph 14 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it refers to and repeats the allegations in paragraphs 24 to 40 below; and

    (c) it denies paragraph 14.

15. As to paragraph 15 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it refers to and repeats the allegations in paragraphs 24 to 40 below; and

    (c) it denies paragraph 15.

16. As to paragraph 16 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it admits that the applicants intend to use the Kraft Trade Mark in Australia from early 2018 in relation to peanut butter and other products; and

    (c) it otherwise denies paragraph 16.

17. As to paragraph 17 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it refers to and repeats the allegations in paragraphs 24 to 40 below; and

    (c) it otherwise denies paragraph 17.

18. As to paragraph 18 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it refers to and repeats the allegations in paragraphs 24 to 40 below; and

    (c) it otherwise denies paragraph 18.

19. As to paragraph 19 it says as follows:

- 60 -

    (a) it refers to and repeats paragraph 11 above;

    (b) it admits that it has transitioned from the brand 'THE GOOD NUT' to 'BEGA';

    (c) it refers to and repeats the allegations in paragraphs 24 to 40 below; and

    (d) it otherwise denies paragraph 19.

20.    As to paragraph 20 it says as follows:

    (a) it refers to and repeats paragraph 11 above;

    (b) it admits that peanut butter that has been sold in Australia by reference to the Kraft Trade Mark has been made in Australia; and

    (c) it otherwise denies paragraph 20.

**Request to cease publishing the Bega Advertisements**

21.    As to paragraph 21 it says as follows:

    (a) it has no immediate intention to cause the Advertisements to be further published in the same form;

    (b) it admits that the applicants have requested Bega to cease certain alleged conduct and that Bega has denied any wrongdoing and has provided only a limited undertaking; and

    (c) it otherwise denies paragraph 21.

**Alleged contravention of the Australian Consumer Law**

22.    It denies paragraph 22.

**Alleged loss and damage**

23.    It denies paragraph 23.

**The 2012 restructure of Kraft's global business**

24.    On about 1 October 2012 Kraft Foods Inc underwent a restructure (**Restructure**):

    (a) there was a 'spin-off' of Kraft Foods Group Inc, which was to primarily conduct the North American grocery business;

    (b) Kraft Foods Inc would primarily retain the snack foods business and the grocery business outside North America; and

    (c) Kraft Foods Inc was renamed Mondelez International Inc.

25.    Pursuant to the terms of the Restructure agreements, the peanut butter business in Australia and associated assets were retained by Mondelez International Inc, including via its wholly-owned subsidiaries.

26.    The Restructure involved a distribution of shares in Kraft Foods Group, Inc to the then-existing shareholders of Kraft Foods Inc to reflect the value of the assets allocated to Kraft Foods Group, Inc and Kraft Foods Inc respectively.

**Particulars**

- 61 -

The shareholders of Kraft Foods Inc were allocated .33 shares in Kraft Foods Group, Inc for every share that they owned in Kraft Foods Inc.

27.     From the time of the Restructure on about 1 October 2012, Mondelez International Inc and Kraft Foods Group, Inc ceased to have any corporate relationship.

**Promotion of the peanut butter products before 2012**

28.     Prior to the Restructure, Kraft Foods Limited:

(a)     manufactured the peanut butter products that it supplied in Australia from manufacturing facilities located in Port Melbourne, Melbourne (**Port Melbourne Factory**);

(b)     employed the technical and production staff with the know-how to make the peanut butter product in the Port Melbourne Factory to its particular recipe and specifications;

(c)     promoted and sold its peanut butter products under and by reference to:

i.      its Australian Trade Mark Registration Nos 156444 and 181518 for 'KRAFT' in class 29 for 'peanut butter'; and

ii.     its Australian Trade Mark Registration No. 778978 for NEVER OILY NEVER DRY in class 29 for 'peanut butter'; and

iii.    its packaging and get-up, including the yellow lid, clear container, and predominantly yellow label;

(d)     generated goodwill in relation to its peanut butter products that was associated with each of:

i.      its Kraft Trade Mark;

ii.     it's NEVER OILY NEVER DRY trade mark; and

iii.    its packaging and get-up.

**Promotion of the peanut butter products following the Restructure**

29.     Following the Restructure, Kraft Foods Limited was renamed Mondelez Australia (Foods) Ltd.

30.     Following the Restructure, Mondelez Australia (Foods) Ltd:

(a)     continued to manufacture the peanut butter products that it supplied in Australia from the same manufacturing facilities at the Port Melbourne Factory, and using the same know-how, recipe and specifications; and

(b)     continued to promote and sell its peanut butter products under and by reference to:

i.      a Kraft Trade Mark;

ii.     its Australian Trade Mark Registration No. 778978 for NEVER OILY NEVER DRY; and

iii.    its packaging and get-up, including the yellow lid, clear container, and predominantly yellow label.

- 62 -

31. As part of the Restructure, Mondelez Australia (Foods) Ltd assigned its rights in its Australian Trade Mark Registration Nos 156444 and 181518 for KRAFT to Kraft Foods Global Brands LLC, which later assigned its rights in those trademarks to Kraft Foods.

32. Following the Restructure, Mondelez Australia (Foods) Ltd was permitted by the assignees of the Kraft trade mark registrations to continue to promote and sell its peanut butter products under and by reference to the Kraft Trade Mark on a royalty- free basis.

33. Pursuant to the Restructure agreements, Mondelez International Inc was permitted to transition from any use of the Kraft Trade Mark to a new trade mark for continued sales of its peanut butter products.

**Particulars**

Clause 3.5(b) Master Ownership and License Agreement Regarding Trademarks and Related Intellectual Property, dated 27 September 2012.

34. In about December 2016 Mondelez Australia (Foods) Ltd:

(a) commenced transitioning from using the Kraft Trade Mark on its peanut butter products to using the THE GOOD NUT trade mark;

(b) continued to promote and sell its peanut butter products under and by reference to:

   i. its Australian Trade Mark Registration No. 778978 for NEVER OILY NEVER DRY; and

   ii. its packaging and get-up, including the yellow lid, clear container, and predominantly yellow label.

35. On about 4 July 2017 Bega acquired Mondelez Australia (Foods) Ltd's peanut butter business in Australia, including:

(a) the manufacturing facilities located at the Port Melbourne Factory; and

(b) all of Mondelez Australia (Foods) Ltd's goodwill associated with its peanut butter products business.

**Particulars**

(i)    Pursuant to the terms of the sale and purchase agreement dated 19 January 2017. A copy will be provided on request subject to the provision of confidentiality undertakings.

(ii)   See in particular clauses 2.1, 6.2 and Schedule 5, Part A, clause 1.2.

36. Since 4 July 2017 Bega has continued to manufacture the same peanut butter products that were formerly manufactured by Mondelez Australia (Foods) Ltd (formerly Kraft Foods Limited), from the same manufacturing facilities located at the Port Melbourne Factory, and using the same know-how, recipe and specifications.

37. On about 4 July 2017 Mondelez Australia (Foods) Ltd assigned its rights in Australian Trade Mark Registration No. 778978 for NEVER OILY NEVER DRY to Bega.

- 63 -

38.     Since about July 2017, Bega has:

    (a) transitioned from using the THE GOOD NUT trade mark to using its BEGA trade mark for its peanut butter products;

    (b) continued to promote and sell its peanut butter products under and by reference to:

        i.     its Australian Trade Mark Registration No. 778978 for NEVER OILY NEVER DRY; and

        ii.     its packaging and get-up, including the yellow lid, clear container, and predominantly yellow label.

39.     Since about October 2012 Kraft Foods has not:

    (a) exercised quality control in respect of the peanut butter products sold in Australia by:

        i.     Mondelez Australia (Foods) Ltd; or

        ii.     Bega; or

    (b) had any other involvement in the manufacture and promotion of the peanut butter products sold in Australia by:

        i.     Mondelez Australia (Foods) Ltd; or

        ii.     Bega.

40.     By reason of the matters alleged above, Kraft Foods does not own any of the goodwill in Australia generated in respect of the sale of peanut butter products in Australia since about October 2012, including in respect of:

    (a) sales made by reference to the Kraft Trade Mark;

    (b) sales made by reference to the NEVER OILY NEVER DRY trade mark; and

    (c) sales made by reference to the packaging and get-up, including the yellow lid, clear container, and predominantly yellow label.

**KRAFT'S REPLY:**

1.     Save for the admissions contained in the Defence, and subject to the allegations below, the Applicants join issue with the Defence.

2.     As to paragraph 5 of the Defence, the Applicants say that the Kraft Brand as defined in paragraph 3 of the Amended Statement of Claim is the word Kraft and/or the Kraft logo and does not include:

    (a) the NEVER OILY NEVER DRY trade mark; or

    (b) the packaging and get-up including the yellow lid, clear container and predominantly yellow label.

3.     As to paragraphs 11 and 12 of the Defence, the Applicants deny the positive allegations therein and say further that the alternative representations pleaded (which are denied) do not foreclose each of the First to Seventh Representations additionally having been made.

- 64 -

4.    The Applicants admit the allegations in paragraph 24 of the Defence.

5.    The Applicants deny the allegation in paragraph 25 of the Defence in circumstances where it is unclear precisely what agreements and what terms are alleged and the Applicants say that under the Restructure agreements:

(a) the Port Melbourne Factory was allocated to Mondelez International Inc. and/or its wholly owned subsidiaries; and

(b) intellectual property rights relating to the peanut butter business (including the Kraft Brand and the Kraft Trade Mark as defined in the Defence) were allocated to the First Applicant.

### PARTICULARS

Clause 2.1(a) of the Master Licence and Ownership Agreement (as amended) referred to in the particulars subjoined in paragraph 8 of the Amended Statement of Claim (the Master Licence Agreement)

6.    As to paragraph 26 of the Defence:

(a) the Applicants admit that the Restructure involved a distribution of shares in Kraft Foods Group, Inc to the then-existing shareholders of Kraft Foods Inc to reflect the value of the assets allocated to Kraft Foods Group, Inc and Kraft Foods Inc respectively;

(b) the Applicants deny that the shareholders of Kraft Foods Inc were allocated .33 shares in Kraft Foods Group, Inc for every share that they owned in Kraft Foods, Inc; and

(c) the Applicants say that shareholders of Kraft Foods Inc were allocated one share in Kraft Foods Group, Inc for each three shares held in Kraft Foods, Inc and paid cash for any excess shares.

7.    The Applicants deny the allegation in paragraph 27 of the Defence and say further:

(a) at around the time alleged Mondelez International, Inc and Kraft Foods Group, Inc ceased to be related corporate entities; and

(b) Mondelez International, Inc and Kraft Foods Group, Inc continued to maintain various contractual relationships including under the Master Licence Agreement.

8.    As to paragraph 28 of the Defence, the Applicants:

(a) admit the allegations in paragraph 28(a);

(b) do not admit the allegations in paragraph 28(b) as they do not presently know;

(c) deny the allegations in paragraph 28(c) except that they admit that Kraft Foods Limited promoted and sold peanut butter products under and by reference to:

i.    the Kraft Trade Mark; and

ii.   packaging and get-up including the yellow lid, clear container, and predominantly yellow label.

- 65 -

(d) deny the allegation in paragraph 28(d) of the Defence and say that any goodwill is generated in relation to the product trade mark and/or product packaging rather than the product itself, and they say further in those circumstances that sale and promotion of peanut butter by Kraft Foods Limited generated goodwill in the Kraft Trade Mark.

9. The Applicants admit the allegations in paragraph 29 of the Defence.

10. As to paragraph 30 of the Defence, the Applicants:

(a) admit the allegations in paragraph 30(a); and

(b) deny the allegations in paragraph 30(b) except that they admit that Mondelez Australia (Foods) Ltd promoted and sold peanut butter products under and by reference to:

    i. the Kraft Trade Mark; and

    ii. packaging and get-up including a yellow lid, clear container, and predominantly yellow label; and

(c) say that the conduct referred to in the previous subparagraph was licensed pursuant to the Master Licence Agreement with the effect that all goodwill generated through the promotion and sale of such peanut butter products inures to the benefit of the First Applicant.

## PARTICULARS

Clauses 3.1 and 3.10 of the Master Licence Agreement.

11. The Applicants admit the allegations in paragraph 31 of the Defence.

12. As to paragraph 32 of the Defence, the Applicants admit that Mondelez Australia (Foods) Pty Ltd was licensed to use the Kraft Trade Mark in relation to peanut butter products pursuant to the Master Licence Agreement, but otherwise deny the allegations contained in that paragraph.

13. As to paragraph 33 of the Defence, the Applicants:

(a) admit that the terms of clause 3.5(b) of the Master Agreement permit a licensee under that agreement to announce the transition of a licensed mark to a new mark;

(b) otherwise deny the allegations in paragraph 33 of the Defence; and

(c) say further that the aforementioned clause does not permit or otherwise provide a defence to misleading and deceptive conduct.

14. As to paragraph 34 of the Defence, the Applicants:

(a) admit the matters in paragraph 34(a) of the Defence;

(b) deny the allegations in paragraph 34(b) except that they admit that Mondelez Australia (Foods) Ltd continued to promote and sell peanut butter products under and by reference to:

    i. the Kraft Trade Mark; and

    ii. packaging and get-up including a yellow lid, clear container, and predominantly yellow label.

15.   The Applicants do not admit the allegations in paragraph 35 of the Defence as they do not presently know.

16.   As to paragraph 36, they admit that since about 4 July 2017 Bega has manufactured peanut butter products from the same manufacturing facilities located at the Port Melbourne Factory but they otherwise do not admit the allegations in paragraph 36.

17.   The Applicants do not admit the allegations in paragraph 37.

18.   ' As to paragraph 38 of the Defence, the Applicants:

(a)   admit that since about 4 July 2017 Bega has sold peanut butter products under the mark THE GOOD NUT in packaging including a yellow lid, clear container and predominantly yellow label;

(b)   say that Bega has never used the Kraft Trade Mark on the label of its peanut butter products and that it has not transitioned from the Kraft Trade Mark to the BEGA trade mark as represented in the Bega Advertisements; and

(c)   otherwise deny the allegations in paragraph 38.

19.   The Applicants deny paragraph 39 of the Defence and say that:

(a)   use by Mondelez Australia (Foods) Limited of the Kraft Trade Mark has been governed by the Master Licence Agreement; and

(b)   all goodwill in the Kraft Mark from 2012 has accrued to the First Applicant.

### PARTICULARS

The Applicants will refer to the Master Ownership Agreement in its entirety at trial including sections 3.8, 3.10 and 3.11.

20.   The Applicants deny paragraph 40 and say further in any event that the First Applicant acquired the goodwill in the Kraft Trade Mark pursuant to the Restructure and continues to own all goodwill in the Kraft Trade Mark accrued prior to that time.

21.   Further, the Applicants say that the positive assertions in paragraph 24 to 40 are not relevant to determining the allegations made in the Amended Statement of Claim in circumstances where the First Applicant is the owner of registered trade marks including Australian Trade Mark Registration Nos. 156444 and 181518 providing it with the exclusive right under the *Trade Marks Act 1995* (Cth) to control and authorise others to use the Kraft Trade Mark and to exploit the goodwill accrued in that trade mark and other trade marks containing the word "KRAFT".

## BEGA'S CROSS-CLAIM:

1.   Bega Cheese Limited (**Bega**) is a company duly incorporated in Australia and able to sue in its corporate name.

2.   HJ Heinz Company Australia Limited (**Kraft Heinz**) is a company duly incorporated in Australia and able to be sued in its corporate name.

3.   Kraft Foods Group Brands LLC (**Kraft Foods**) is a company duly incorporated in Delaware, United States of America, and is able to be sued in

- 67 -

its corporate name.

**Factual background**

4.  Bega refers to and repeats as positive averments each of the allegations in paragraphs 24 to 40 of its defence dated 4 December 2017.

**Kraft Heinz press release**

5.  On 24 October 2017 Kraft Heinz published, alternatively authorised the publication on its behalf of, a press release titled 'Kraft Returns to Australian Stores' (Press Release).

6.  The Press Release included the following words: "*In a move that will be further celebrated by millions of Australians, Kraft Peanut Butter will also be back on Australian supermarket shelves in early 2018 ... We are listening to our consumers and we know that Kraft Peanut Butter is the one Australians love.*"

7.  In context those words conveyed the representation that in early 2018 Kraft Heinz will be supplying a peanut butter product in Australia under the Kraft Trade Mark (as defined in paragraph 3(a) of the defence) that will be the same as the product that was until about June 2017 sold in Australia by reference to the Kraft Trade Mark whether alone or in combination with another brand (the Same Product Representation).

8.  By issuing the Press Release Kraft Heinz made the Same Product Representation to a not inconsiderable number of consumers.

9.  The peanut butter product that was until about June 2017 sold in Australia by reference to the Kraft Trade Mark whether alone or in combination with another brand was manufactured from a production facility in Port Melbourne (Port Melbourne Factory).

10. Since about July 2017 Bega has:

    (a) owned the Port Melbourne Factory;

    (b) employed the technical and production staff with the know-how to make the peanut butter product in the Port Melbourne Factory; and

    (c) produced its own peanut butter product in the Port Melbourne Factory to the particular recipe and specifications of, and consistent with, the product manufactured in the Port Melbourne Factory prior to Bega owning it.

11. By reason of:

    (a) the matters alleged in paragraphs 9 and 10 above;

    (b) the matters alleged in paragraphs 24 to 40 of the defence; and

    (c) the fact that the taste and other organoleptic properties of peanut butter vary with different production facilities,

    it may be inferred that Kraft Heinz will be unable to manufacture and sell the same peanut butter product that was until about June 2017 sold in Australia by reference to the Kraft Trade Mark whether alone or in combination with another brand.

- 68 -

12.     By reason of the matters alleged in paragraphs 9 to 11 above, which Kraft Heinz was aware of, the Same Product Representation was false.

13.     The Same Product Representation was a representation with respect to a future matter within the meaning of s 4(1) *Australian Consumer Law*.

14.     By application of s 4(2) *Australian Consumer Law*, Kraft Heinz is taken not to have had reasonable grounds for making the Same Product Representation.

15.     Further or alternatively, by reason of the matters alleged in paragraphs 9 to 11 above, of which it was aware, Kraft Heinz did not have reasonable grounds for making the Same Product Representation.

**Section 18 *Australian Consumer Law***

16.     Kraft Heinz has made, and will continue to make, the Same Product Representation in trade and commerce.

17.     By engaging in the conduct alleged at paragraph 5 above, and thereby making the Same Product Representation, and by reason of the matters alleged in paragraphs 6 to 15 above, Kraft Heinz has engaged in, and will continue to engage in, conduct that is misleading or deceptive or likely to mislead or deceive.

18.     By reason of the matters alleged above, Kraft Heinz has contravened, and intends to continue to contravene, section 18 of the *Australian Consumer Law*.

**Kraft Foods is a person 'involved' in the contravention**

19.     Kraft Foods is a member of the same corporate group as Kraft Heinz.

20.     Kraft Foods is the registered owner of Australian Trade Mark Registration Nos 156444 and 181518 for KRAFT in class 29 for 'peanut butter'.

21.     Kraft Foods is authorising or purporting to authorise Kraft Heinz to display the Kraft Trade Mark in respect of the sale in Australia from early 2018 of peanut butter products.

22.     By reason of the matters alleged above Kraft Foods has:

    (a)   aided, abetted, counselled and/or procured the contravention by Kraft Heinz alleged above; and/or

    (b)   induced the contravention by Kraft Heinz alleged above; and/or

    (c)   been knowingly concerned in and/or party to the contravention by Kraft Heinz alleged above,

and will continue to do so in the future.

23.     By reason of the matters alleged above, Kraft Foods is a person 'involved' in the contravention by Kraft Heinz of section 18 *Australian Consumer Law* alleged above, within the meaning of section 2(1) *Australian Consumer Law*.

**Loss and damage**

24.     By reason of the contraventions alleged above, Bega will suffer loss and damage.

- 69 -

**Particulars**

(i)     Loss of sales.

(ii)    Diminution in the value of the goodwill associated with its peanut butter products.

## KRAFT'S DEFENCE TO CROSS-CLAIM:

1.     They admit paragraph 1.

2.     They admit paragraph 2.

3.     They admit paragraph 3.

4.     As to paragraph 4, they do not plead to this paragraph as it does not raise an allegation against them. They otherwise refer to paragraphs 4 to 21 of the Reply to Defence dated 12 December 2017.

5.     They admit paragraph 5.

6.     Subject to production of the entirety of the Press Release at trial, they admit paragraph 7.

7.     As to paragraph 7 thereof:

(a) they deny paragraph 7;

(b) they say further the Same Product Representation is not conveyed by the Press Release; and

(c) they say further that as at the date of the Press Release that:

     i.     Kraft Peanut Butter was not on Australian supermarket shelves; and

     ii.     Kraft Heinz intended that a product called Kraft Peanut Butter would be sold under the Kraft Brand and this would appear on supermarket shelves in early 2018.

8.     They deny paragraph 8.

9.     They admit paragraph 9.

10.     They do not admit the allegations in paragraph 10 as they do not know.

11.     They deny paragraph 11 and say further that even if the Same Product Representation was made (which is denied) this does not require that the products produced are identical and are produced in the Port Melbourne Factory.

12.     They deny paragraph 12 and say further that:

(a) the peanut butter to be sold by the Second Applicant / Second Cross-Respondent in Australia under the Kraft Brand will be the same or substantially the same as and consistent with the peanut butter sold in Australia under the Kraft Brand prior to 1 July 2017; and

(b) if the Same Product Representation was made then it is true and Kraft Heinz believed it to be true in circumstances where it holds the opinion that it can manufacture peanut butter that is the same or substantially the

- 70 -

same as peanut butter sold in Australia under the Kraft Brand prior to 1 July 2017 albeit that production will not take place at the Port Melbourne Factory.

13. They deny paragraph 13.

14. They deny paragraph 14.

15. They deny paragraph 15.

16. As to paragraph 16, they admit that any representation made was in trade or commerce, but they otherwise deny paragraph 16 except that they say that Kraft Heinz is entitled to use the Kraft Brand after 1 January 2018 and therefore entitled to tell consumers that it will re-introduce into the Australian market a product which will be called "Kraft Peanut Butter".

17. They deny paragraph 17.

18. They deny paragraph 18.

19. They admit paragraph 19.

20. They admit paragraph 20.

21. They deny paragraph 21 except that they say that when a product called Kraft Peanut Butter is sold in Australia that it will be authorised by Kraft Foods as owner of various trade marks including Australian Trade Mark Registration Nos. 156444 and 181518.

22. They deny paragraph 22.

23. They deny paragraph 23.

24. They deny paragraph 24 and say the representations alleged do not concern any products currently sold by Bega which are sold under different brands including "Good Nut" and "Bega" and Bega has no right to use the Kraft Brand after 1 January 2018.